**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NATIONAL FEDERATION OF THE BLIND;
SPECIAL OLYMPICS MARYLAND,
INCORPORATED,

*Plaintiffs-Appellants,*

v.

FEDERAL TRADE COMMISSION,
*Defendant-Appellee.*

No. 04-1378

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-03-963-JFM)

Argued: December 1, 2004

Decided: August 26, 2005

Before WILKINSON, TRAXLER, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Traxler joined. Judge Duncan wrote a dissenting opin-
ion.

**COUNSEL**

**ARGUED:** M. Errol Copilevitz, COPILEVITZ & CANTER, L.L.C.,
Kansas City, Missouri, for Appellants. Michael Daniel Bergman,
FEDERAL TRADE COMMISSION, Washington, D.C., for Appel-
lee. **ON BRIEF:** William E. Raney, Kristen E. Bloemker,

COPILEVITZ & CANTER, L.L.C., Kansas City, Missouri, for Appellants. William E. Kovacic, General Counsel, John F. Daly, Deputy General Counsel for Litigation, Lawrence DeMille-Wagman, FEDERAL TRADE COMMISSION, Washington, D.C., for Appellee.

## OPINION

WILKINSON, Circuit Judge:

This case presents a challenge to the Federal Trade Commission's regulation restricting telemarketing practices as they apply to charitable fundraising. The regulation requires callers to make certain disclosures, refrain from making late-night, early-morning, and "abandoned calls" (calls followed by silence), and comply with a charity-specific "do-not-call list." Since the FTC has no jurisdiction over non-profit organizations, the new rule does not apply to calls made by "in house" charity staff or volunteers. It does, however, apply to "telefunders" — that is, professional fundraisers from for-profit companies who solicit donations on behalf of charities. The appellants, two charities who contract with these companies, argue that the regulation is beyond the FTC's authority and violates the First Amendment.

We think Congress clearly authorized the FTC to promulgate this new rule. Because we are further convinced that it constitutes a "reasonable regulation," that is "narrowly drawn" to serve a "sufficiently strong subordinating interest that the [government] is entitled to protect," we find it to be constitutional. *Sec. of State of Maryland v. Munson*, 467 U.S. 947, 960-961 (1984) (quotation omitted). The regulation preserves the important right of charities to make telephone solicitations. To strike down the rule, however, would disable the democratic branches from taking even the most modest steps necessary to protect the home environment from intrusive phone calls.

I.

In 1994, Congress passed the Telemarketing Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"). Pub. L. No. 103-297,

108 Stat. 1545 (codified as amended at 15 U.S.C. §§ 601 et seq. (2000)). That legislation instructed the FTC to "prescribe rules prohibiting deceptive . . . and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1) (2000). Specifically, Congress directed the FTC to forbid "unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy," to restrict "the hours of the day and night when unsolicited telephone calls can be made," and to require that callers disclose information about the nature and purpose of the call. *Id.* § 6102(a)(3).

Two further provisions of the 1994 Telemarketing Act are particularly relevant to this case. First, Congress defined "telemarketing" to only cover calls "conducted to induce purchases of goods or services." *Id.* § 6106(4). Phone calls seeking charitable donations were thus outside the scope of the Telemarketing Act as it existed in 1994.

Second, Congress explained that the Telemarketing Act did nothing to affect activity beyond the FTC's jurisdiction. *Id.* § 6105(a). In this regard, Congress cross-referenced the jurisdictional provisions of the Federal Trade Commission Act ("FTCA"). The FTCA gives the FTC jurisdiction over "persons, partnerships, or corporations," with some exceptions not relevant here. *Id.* § 45(a)(2). An entity is only a "corporation," for FTCA purposes, if it is "organized to carry on business for its own profit or that of its members." *Id.* § 44. Thus, according to the FTC's organic statute, non-profit organizations fall outside the scope of the agency's jurisdiction. And, as Congress made clear, the Telemarketing Act did nothing to change that fact. *Id.* § 6105(a).

In 1995, the FTC implemented Congress' directives by promulgating the original Telemarketing Sales Rule ("TSR"). 16 C.F.R. § 310 et seq. (1995). The TSR imposed several restrictions on telemarketers — requiring them, inter alia, to make certain disclosures, obey time restrictions, and refrain from calling consumers who have asked not to be called by that particular seller. Before the 1995 TSR became effective, the FTC issued an advisory statement clarifying that the TSR did not regulate professional telemarketers calling on behalf of non-profit organizations (these professionals are often referred to as "telefunders"). The agency justified this decision by explaining that

soliciting donations did not qualify as "telemarketing" under the Telemarketing Act.

Following new congressional instructions, however, the FTC's position towards telefunders has changed. In October 2001, Congress enacted the USA PATRIOT Act, which contained a section (section 1011) entitled "Crimes Against Charitable Americans." Pub. L. No. 107-56, 115 Stat. 396 (2001).

This section amended the Telemarketing Act in three significant ways. First, Congress inserted the phrase "fraudulent charitable solicitations" in its general description of what "deceptive telemarketing acts or practices" the FTC should regulate. 15 U.S.C.A. § 6102(a)(2) (West Supp. 2004). Second, Congress added a new subsection specifically directing the FTC to include:

> a requirement that any person engaged in telemarketing for the solicitation of charitable contributions, donations, or gifts of money or any other thing of value, shall promptly and clearly disclose to the person receiving the call that the purpose of the call is to solicit charitable contributions, donations, or gifts, and make such other disclosures as the Commission considers appropriate. . . .

*Id.* § 6102(a)(3)(D). And third, Congress altered the Act's definition of "telemarketing" to include a reference to charitable solicitations.[1] *Id.* § 6106(4).

One crucial part of the Telemarketing Act, however, remained unchanged by the PATRIOT Act. The PATRIOT Act did not purport to alter the FTC's jurisdiction, which is still governed by the jurisdictional provisions in the FTCA. As explained above, those provisions do not cover non-profit organizations. The PATRIOT Act, therefore, expanded what "*acts and practices*" could be regulated by the FTC

---

[1]"Telemarketing" is now defined in the Act to be "a plan, program, or campaign which is conducted to induce purchases of goods or services, or a charitable contribution, donation, or gift of money or any other thing of value, by use of one or more telephones and which involves more than one interstate telephone call." *Id.*

under the Telemarketing Act, but it did not change what *type of entity* was subject to the FTC's control.

In January 2002, the FTC issued a notice of proposed rulemaking to adjust the TSR after the changes Congress had made to the Telemarketing Act. It received approximately 64,000 comments, some calling for more regulation and some asking for less. It then conducted a three-day public forum. In reviewing the feedback it received, the FTC concluded that "consumers are disturbed by unwanted calls regardless of whether the caller is seeking to make a sale or to ask for a charitable contribution." 68 Fed. Reg. 4637.

On January 29, 2003, the FTC promulgated a new TSR. 68 Fed. Reg. 4580 (Jan. 29, 2003) (codified at 16 C.F.R. § 310 (2005)). Attempting to formulate this new rule in accordance with Congress' directions, the FTC faced a quandary. Congress had not altered the jurisdictional provisions in the Telemarketing Act, thus leaving the FTC without jurisdiction over non-profit organizations. But, at the same time, Congress did amend the definition of "telemarketing" to cover charitable solicitations. To reconcile those two congressional mandates, the agency articulated the distinction which is now being challenged. It stated:

> Reading the amendments to the Telemarketing Act effectuated by § 1011 of the USA PATRIOT Act together with the unchanged sections of the Telemarketing Act compels the conclusion that for-profit entities that solicit charitable donations now must comply with the TSR, although the Rule's applicability to charitable organizations themselves is unaffected.

*Id.* at 4585. Thus, professional telefunders calling on behalf of charities are subject to the new TSR, while "in house" callers from the charities themselves are not. It is this distinction that lies at the heart of the instant dispute.

The new TSR imposed several new restrictions on telemarketers generally, but only some of those restrictions apply to telefunders. Five such provisions are being challenged here:

(1) prohibitions on placing calls before 8:00 a.m. or after 9:00 p.m., 16 C.F.R. § 310.4(c);

(2) prohibitions on "abandoned calls" (a call is abandoned when a person at home answers the phone and is not connected to a telemarketer within two seconds), 16 C.F.R. § 310.4(b)(1)(iv);

(3) a requirement that callers promptly explain that they are seeking donations, and identify the charity on behalf of which the request is being made, 16 C.F.R. § 310.4(e);

(4) a requirement that telemarketers transmit their name and phone number to caller identification services ("caller ID"), 16 C.F.R. § 310.4(a)(7); and

(5) an obligation that telemarketers refrain from calling a person who has previously asked not to be called by a specific charity, 16 C.F.R. § 310.4(b)(1)(iii)(A).

Similar to this last restriction, the TSR also included a national do-not-call registry (one that is not entity-specific) which telemarketers are required to respect. However, the rule does not require that telefunders adhere to the national do-not-call list — instead requiring only their adherence to a more modest charity-specific list. 16 C.F.R. § 310.6(a).

Appellants National Federation of the Blind and Special Olympics Maryland, Inc. ("the charities") are nonprofit organizations that qualify for tax-exempt status under section 501(c)(3) of the Internal Revenue Code. Both charities require donations to carry out their important work. To solicit donations, these charities rely on professional telefunders. Because the telefunders are restricted by the new TSR, the charities say that their fund-raising efforts have been adversely affected.

The two charities filed suit against the FTC in the United States District Court for the District of Maryland. They challenged the amended TSR on the grounds that the rule exceeded the statutory

authority of the FTC and, in the alternative, violated the First and Fourteenth Amendments to the Constitution.

Both parties filed cross-motions for summary judgment, and on February 24, 2004, the district court entered judgment for the FTC. *Nat'l Fed. of the Blind v. FTC*, 303 F. Supp. 2d 707 (D. Md. 2004). The charities now appeal. We review these questions of law de novo. *United States v. Deaton*, 332 F.3d 698, 703-04 (4th Cir. 2003).

## II.

The charities first claim that the new TSR is beyond the FTC's statutory authority. Plaintiffs contend that when Congress amended the Telemarketing Act in 2001 it only intended for the FTC to regulate *fraudulent* charitable solicitations, not calls made in the normal course of charitable fundraising. According to the charities, since time restrictions and prohibitions on abandoned calls, for instance, are not rules aimed at preventing fraud, they are beyond the agency's statutory mandate.

When an agency's construction of a statute is challenged, we turn to the familiar framework set forth in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). *Chevron* instructs that we first review the statute to see if the intent of Congress is clear. If Congress has not answered the question at hand, then we defer to the agency's interpretation of the statute, so long as it is a reasonable one. *Id. See also Sigma-Tau Pharm. Inc. v. Schwetz*, 288 F.3d 141, 144 (4th Cir. 2002).

Here, we need not go past the first step. For it is appropriate to "apply canons of statutory construction at step one of the *Chevron* inquiry." *E.E.O.C. v. Seafarers Int'l Union*, 394 F.3d 197, 203 (4th Cir. 2005). And a traditional canon of statutory interpretation leads us to conclude that Congress has answered the current question. It is well-established that:

> Congress is presumed to enact legislation with knowledge of the law. The upshot of this canon of statutory interpretation is that absent a clear manifestation of contrary intent, a

> newly-enacted or revised statute is presumed to be harmonious with existing law.

*In re Witt*, 113 F.3d 508, 513 (4th Cir. 1997) (internal citations and quotations omitted). *See also United States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995).

As the district court noted, the 1994 Telemarketing Act instructed the FTC to regulate telemarketers *both* to prevent fraud *and* to protect the privacy of the home. Not surprisingly, the original TSR addressed both concerns — promulgating regulations which included time restrictions (to protect privacy) and disclosure requirements (to prevent fraud).

Congress amended the Telemarketing Act in 2001 to include charitable solicitations, but it did not enact a full-scale overhaul of the statute and suddenly render abusive or intrusive calls beyond the FTC's purview. Thus, when Congress altered the Act's definition of "telemarketing" to encompass calls soliciting charitable donations, it surely knew that it was making those calls subject to the same restrictions that other telemarketing calls were subject to under the original version of the Act. If Congress had intended the opposite result, it would have said so. *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) ("Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (internal quotation omitted).

The charities point to the fact that when Section 1101 of the PATRIOT Act was passed, Senator Mitch McConnell expressed the hope that it would target fraudulent charities who were preying on sympathetic Americans following the attacks of September 11, 2001. *See* 104 Cong. Rec. S10059, 10065 (Oct. 2, 2001). While this is true, it does not change the plain text of the statute. The PATRIOT Act expanded the definition of "telemarketing" to include "a charitable contribution, donation, or gift of money or any other thing of value." 15 U.S.C.A. § 6106(4) (West Supp. 2004). This is a general reference to charitable solicitations. Nothing in the definition suggests that only

fraudulent charitable calls are proper subjects for regulation, or that abusive or intrusive solicitations are exempt from regulation.

In addition, the charities point to the amendment that changes the preamble to the Telemarketing Act. Currently the general directive to the FTC reads:

> The Commission shall include in such rules respecting deceptive telemarketing acts or practices a definition of deceptive telemarketing acts or practices *which shall include fraudulent charitable solicitations*, and which may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing.

*Id.* § 6102(a)(2) (emphasis added to indicate the new language). This language is not exhaustive; it merely explains that the FTC "shall include," among others, regulations to target fraudulent charitable solicitations. Any confusion regarding the scope of this directive is clarified by the more technical section of the Act which defines the relevant terms. The definition of "telemarketing," as explained above, was amended to include calls for "charitable contribution[s]" generally, and does not limit the Act's coverage to only those calls which are likely to be fraudulent. *Id.* § 6106(4).

We therefore conclude that Congress intended for all conduct now encompassed under the broadened definition of "telemarketing" to be subject to FTC regulations passed for the purpose of preventing fraud and protecting the home. The FTC enacted the TSR pursuant to these directions, and we find it was well within its statutory authority to do so.

### III.

We thus turn to the plaintiffs' claim that the TSR violates the First Amendment. Three Supreme Court cases address First Amendment challenges to regulations on professional charitable fundraising. *See Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980); *Sec. of State of Maryland v. Joseph Munson Co.*, 467 U.S. 947 (1984); *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781 (1988).

From this trilogy we learn that "charitable solicitations" have "not been dealt with as purely commercial speech." *Riley*, 487 U.S. at 788. This is so because they "involve a variety of speech interests that are within the protection of the First Amendment." *Id.* (quotation omitted). We also know, however, that the protection accorded to charitable solicitations is not absolute. For "[s]oliciting financial support is undoubtedly subject to reasonable regulation" so long as the regulation is "undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech." *Schaumburg*, 444 U.S. at 632.

Thus a balance must be struck. A regulation will be sustained if (1) it "serves a sufficiently strong, subordinating interest that the [government] is entitled to protect" and (2) it is "narrowly drawn . . . to serve the interest without unnecessarily interfering with First Amendment freedoms." *Munson*, 467 U.S. at 960-61 (quoting *Schaumburg*, 444 U.S. at 636-37). We hold that the FTC's new rule meets these two requirements.[2]

IV.

The FTC has identified two government interests that the TSR was designed to advance — the prevention of fraud and the protection of privacy in the home. Our initial task is to ask whether these interests qualify as "sufficiently strong, subordinating interest[s] that the [government] is entitled to protect." *Munson*, 467 U.S. at 960-61 (quoting

---

It is unclear whether this standard amounts to "strict scrutiny" (as the charities allege) or to the less stringent "intermediate scrutiny" (as the FTC urges). The district court believed it was applying intermediate scrutiny since the present regulations were reminiscent of ones upheld as time, place, and manner restrictions. *See Nat'l Fed. of the Blind of Arkansas v. Pryor*, 258 F.3d 851, 855 (8th Cir. 2001) ("The *Munson / Village of Schaumburg* standard and the time-place-and-manner standard are obviously very similar."); *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1247 (10th Cir. 2000) (holding that content-neutral regulations of charitable solicitations are subject to "an intermediate level of scrutiny").

Regardless of the label, the substance of the test is clear. And the TSR passes it because it is "narrowly drawn" to serve a "sufficiently strong subordinating interest." *Munson*, 467 U.S. at 960-61 (quotation omitted).

*Schaumburg*, 444 U.S. at 636). For the following reasons, we conclude they do.

### A.

First, we address the FTC's desire to protect consumers from fraud. At least one of the challenged regulations — the requirement that solicitors promptly disclose the nature and purpose of their call — aims to prevent fraud.

Our evaluation of this proffered government interest is not difficult. For although the Court in *Schaumburg*, *Munson*, and *Riley* ultimately concluded that the specific restrictions in each case were not narrowly tailored to prevent fraud, it was beyond dispute in all three cases that "[t]he interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation." *Riley*, 487 U.S. at 792. *See also Munson*, 467 U.S. at 961; *Schaumburg*, 444 U.S. at 836.

### B.

The FTC defends its other regulations on the basis of an interest that the Court in *Schaumburg*, *Munson*, and *Riley* did not address — namely, an interest in safeguarding residential privacy.[3] *See Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 619-20 (2003) (characterizing laws invalidated in *Schaumburg*, *Munson*, and *Riley* as ones involving fraud prevention). The goal behind the time restraints, for example, is not to prevent fraud, but to allow family life to proceed undisturbed by phone calls in the evening and early morning hours.

It is hard to argue, as plaintiffs must, that the protection of residential privacy does not qualify as a "sufficiently strong subordinating interest that the [government] is entitled to protect." *Munson*, 467

---

[3]Although preventing "undue annoyance" was mentioned as a potential state interest in the *Schaumburg* case, 444 U.S. at 636, the Court subsequently explained that the "primary interest" proffered in *Schaumburg* was actually an interest "in preventing fraud." *Munson*, 467 U.S. at 961. *See also Riley*, 487 U.S. at 788.

U.S. at 960-61 (quotation omitted). For the Supreme Court has explained that "'[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.'" *Frisby v. Schultz*, 487 U.S. 474, 484 (1988) (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)).

Indeed, the Court's First Amendment jurisprudence has long "recognized that '[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.'" *Id.* (quoting *Carey*, 447 U.S. at 471). From this principle, it follows that:

> One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different.
>
> . . . [A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

*Id.* (internal citations omitted). *See also Hill v. Colorado*, 530 U.S. 703, 716-17 (2000); *FCC v. Pacifica Found.*, 438 U.S. 726, 748 (1978); *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 738 (1970) ("That we are often captives outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere.")

The significance that the Court places on residential privacy should not be surprising. Protecting the sanctity of the family environment is important enough to actually serve as the basis for a constitutional right in many different contexts. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (right to be secure from warrantless search in one's home); *Stanley v. Georgia*, 394 U.S. 557, 565 (1969)(right to read material of choice in one's home).

Admittedly, these cases guard against intrusions by a state agent, as opposed to the private interruptions in the present case. But if protecting the home is something that serves as the basis for a constitutional right, then it surely must also serve as a substantial government interest that the democratic process is entitled to protect. Or, put differently, if the state is constrained from breaching the sanctity of the home environment, then the state is allowed to protect what it cannot casually breach. A contrary conclusion would turn the Constitution into a house divided — a document at war within itself. *See Burson v. Freeman*, 504 U.S. 191, 198 (1992) (a proffered government interest in regulating speech is more compelling when the interest itself is the basis of a constitutional right).

In short, the judicial branch and the democratic branches of our government are hardly compelled to work at cross-purposes. And the democratic process is not compelled to leave families prey to unwanted solicitations and hang-ups at all hours and against their wishes. We are thus convinced that the FTC's second proffered justification for the TSR constitutes a "sufficiently strong subordinating interest that the [government] is entitled to protect." *Munson*, 467 U.S. at 960-61 (quotation omitted).[4]

V.

Our next inquiry is whether the challenged provisions of the TSR are "narrowly drawn . . . to serve the interest[s] without unnecessarily interfering with First Amendment freedoms." *Munson*, 467 U.S. at

---

[4]Like the district court, we find no merit to plaintiffs' argument that the FTC cannot assert an interest in protecting residential privacy because people do not generally feel imposed on by charitable solicitations. The agency explicitly rejected this possibility, relying on the fact that it received relatively few answers in response to a survey question asking whether charitable fundraisers and commercial telemarketers should be treated differently. 68 Fed. Reg. at 4637 n.685. We think the agency's interpretation of the record is a reasonable one. As the district court explained, "[i]ndeed, if more people distinguished charitable and commercial calls with respect to the privacy intrusion involved, they presumably would have responded to the question." *Nat'l Fed. of Blind*, 303 F. Supp. 2d at 720 n.11.

961 (quotation omitted). Because these regulations are modest restrictions on speech — particularly compared to the ones invalidated in *Schaumburg*, *Munson*, and *Riley* — and because they are not impermissibly "underinclusive," we find that they satisfy the requirement that they be narrowly tailored.

### A.

The charities argue that the five provisions of the TSR challenged here are substantial burdens on speech. The FTC claims them to be only minor restrictions that actually permit a significant amount of speech to occur. We shall take up the provisions in turn.

First, we address the prohibition of "abandoned calls." 16 C.F.R. § 310.4(b)(1)(iv). A call "is 'abandoned' under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two seconds of the person's completed greeting." *Id.* To label this restriction a restraint of speech at all is a generous characterization. For "abandoned calls," by definition, involve no *speech* — they leave the recipient of the call frustrated by *silence* on the other end of the line. A perfectly reasonable person can find silence or repeated silences at the other end of a phone unnerving. Particularly if one is elderly or lives alone, such silences can stoke fears and be unsettling. We think this restriction on speech (if one can call it that) is modest at best and is surely narrowly tailored to protect "the sanctity of the home." *Frisby*, 487 U.S. at 484 (quotation omitted).

Second, the charities challenge the time restriction provision of the TSR which prohibits solicitors from placing calls before 8:00 a.m. or after 9:00 p.m. *See* 16 C.F.R. § 310.4(c). We note that this rule leaves a significant amount of time — 13 hours a day — when calls are permitted. In fact, the window for permissible calling includes the dinner hour, a time when families are quite likely to be home. At bottom, what the plaintiffs seek is a constitutional right for telefunders to call a potential donor even in the wee hours of the morning. Merely to state such a proposition is to acknowledge its untenability.

Indeed, these regulations are narrowly drawn to protect only the most private aspects of a family's time. After 9:00 p.m., family mem-

bers might, for example, be cleaning house for the night, bathing, paying bills, discussing homework, planning this or that, reading, watching TV, or simply getting ready to turn in. Before 8:00 a.m., they might be eating breakfast, dressing, shaving, or fixing lunch for spouses or kids. The First Amendment does not require us to interrupt these family moments, and the only burdens on speech imposed by the TSR time restrictions protect just the most personal hours of a family's day.

Third, the charities take issue with the entity-specific "do not call list." This regulation forbids telefunders from calling a person on behalf of a specific charity when the recipient has previously requested not to be called by that charity. 16 C.F.R. § 310.4(b)(1)(iii)(A). Telefunders are not, however, subject to the more restrictive national "do not call list" which forbids calls to people who have put their names on a general nation-wide opt-out registry. That provision (which commercial telemarketers must obey) was recently upheld by the Tenth Circuit in *Mainstream Marketing Services, Inc. v. FTC*, 358 F.3d 1228 (10th Cir.), *cert. denied*, 125 S. Ct. 47 (2004). In addressing the "narrowly tailored" question, the Tenth Circuit remarked:

> [T]he national do-not-call registry is narrowly tailored because it does not over-regulate speech; rather, it restricts only calls that are targeted at unwilling recipients. Cf. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("There simply is no right to force speech into the home of an unwilling listener.") . . .
>
> . . . The Supreme Court has repeatedly held that speech restrictions based on private choice (i.e. an opt-in feature) are less restrictive than laws that prohibit speech directly.

*Id.* at 1242.

We are persuaded by the Tenth Circuit's reasoning in *Mainstream Marketing*, and we likewise agree with the analogy it drew to *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728 (1970). In *Rowan*, the Court upheld a law permitting a resident to stop companies from mailing advertisements that the resident believed to be provocative. *Id.* at 729-

30. The Court emphasized that this speech restraint was based on a private actor's choice. It explained that "Congress has erected a wall — or more accurately permits a citizen to erect a wall — that no advertiser may penetrate without his acquiescence. . . . The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain." *Id.* at 738.

The parallels between the law at issue in *Rowan* and the do-not-call list in this case are unmistakable. If consumers are constitutionally permitted to opt out of receiving mail which can be discarded or ignored, then surely they are permitted to opt out of receiving phone calls that are more likely to disturb their peace. In this way, a do-not-call list is more narrowly tailored to protecting privacy than was the law in *Rowan*.

Moreover, this particular restriction seems even more reasonable given the fact that the FTC has only subjected telefunders to a charity-specific list. Under this procedure, a consumer cannot report to a central authority that he wishes not to be called by any telemarketers generally; he must instead repeat his request as to each caller individually. This charity-specific alternative to a national list is an option that the *Mainstream Marketing* court called "extremely burdensome to consumers." 358 F.3d at 1244. In light of this, we have no trouble finding the charity-specific restriction on speech to be a permissibly narrow means of protecting the home environment.

Fourth, the charities challenge the TSR provision requiring telefunders to transmit their name and phone number to caller ID services. 16 C.F.R. § 310.(a)(7). This minimal restriction simply allows consumers to screen and ignore telemarketing calls that come at a bad time. Like the do-not-call list, this provision is narrowly tailored to protect privacy because it only "effectively block[s] . . . the calls that cause the problems the government [seeks] to redress." *Mainstream Marketing*, 358 F.3d at 1238. Just as a peep-hole in a door allows residents to pre-select whom they wish to welcome into their homes, so caller ID information allows residents to pre-select whom they wish to speak to on a particular evening. This rule does not stop a telefunder from calling, nor does it prevent a potential donor from answering the phone when it is convenient. It merely gives families

a tool specifically designed to protect their private time, and it is thus narrowly tailored to serve that government interest.

Fifth and finally, the charities object to the disclosure provision of the TSR which requires telefunders to promptly explain that they are seeking donations on behalf of a specific charity. 16 C.F.R. § 310.4(e). We can easily reject this challenge because the Supreme Court has implicitly rejected it already. In *Riley* itself, the Court held that "nothing in this opinion should be taken to suggest that the State may not require a fundraiser to disclose unambiguously his or her professional status. On the contrary, such a narrowly tailored require-ment would withstand First Amendment scrutiny." 487 U.S. at 799 n.11. If the First Amendment permits an obligation for a telefunder to disclose his professional status, then surely it also permits the pres-ent modest disclosure requirement — only to state the name of the charity and the purpose of the call.

In reviewing these rules, we have no wish to exaggerate. Not every home is a "peaceable kingdom." And it is not the end of the world when a family receives an abandoned call or a late night call that interrupts its evening. But it is one more small strain that families already stressed by twenty-first century life are forced to endure. Our Constitution does not require that we add to family burdens by forbid-ding even the most reasonable and minor restrictions on telemarketing practices.

## B.

Notwithstanding plaintiffs' arguments to the contrary, these five FTC regulations are very different from the ones at issue in *Riley*, *Munson*, and *Schaumburg*. Those three cases, as the Supreme Court has subsequently explained, considered "prophylactic statutes designed to combat fraud by imposing prior restraints on solicitation when fundraising fees exceeded a specified reasonable level." *Madi-gan*, 538 U.S. at 612 (2003). The restrictions at issue in this case are, quite frankly, horses of a different color.

In *Schaumburg*, a local community passed an ordinance requiring every person intending to solicit charitable donations to apply for a permit. 444 U.S. at 623-24. A permit would issue only if an applica-

tion contained "satisfactory proof that at least seventy-five percent of the proceeds of such solicitations [would] be used directly for the charitable purpose of the organization." *Id.* at 624. The Supreme Court found the law to be unconstitutional because it could not find "any substantial relationship between the 75-percent requirement" and an interest in preventing fraud or protecting privacy. *Id.* at 638.

Clearly, the law in *Schaumburg* is very different from the regulation in the present case. First, the TSR does not involve an application for a license, which is a prior restraint typically disfavored in First Amendment cases. *See, e.g.*, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992). Moreover, while the blunt and broad 75% rule was not narrowly tailored to either prevent fraud or to protect privacy, the regulations here (as demonstrated above) are carefully crafted for precisely those purposes. Four of the challenged restrictions were designed specifically to weed out unwanted and invasive calls. Indeed, the caller ID and do-not-call list provisions actually place the decision of specifying just which speech is restricted with the consumer, not with the government. Meanwhile, the fifth requirement — the disclosure provision — seeks to prevent fraud by requiring telefunders to be forthright about their reason for calling.

The state statute struck down in *Munson* is also a far cry from the FTC's regulation here. In *Munson*, the state of Maryland passed a law similar to the one at issue in *Schaumburg*, but with a slightly more flexible twist. 467 U.S. at 950-51. The law prohibited charities from paying professional fundraisers more than 25% of the amount they raised, but permitted a waiver of this rule if the restriction "would effectively prevent the charitable organization from raising contributions." *Id.* The Court was not persuaded that the waiver saved the regulation. It found, as in *Schaumburg*, that fraud could be prevented by "measures less intrusive than a direct prohibition on solicitation." *Id.* at 961.

Unlike the *Schaumburg* and *Munson* statutes, the TSR does not impose "a direct prohibition on solicitation." *Id.* It does not set up a flat percentage limitation on how much commission a professional fundraiser can take home. Rather, it merely restrains when and how a call can be made and it does so largely in an effort to protect con-

sumer privacy. The difference between a flat prohibition of the sort condemned in *Schaumburg* and *Munson* and the regulations here is a difference of kind, not simply one of degree.

Finally, plaintiffs place heavy reliance on the third case of this trilogy, *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781 (1988). The statute in *Riley* directly regulated telefunders in three different ways. First, it prohibited the professional fundraisers from collecting "unreasonable or excessive" fees. Those terms were defined by a three-tiered schedule, assigning different standards depending on what percentage commission the telefunders collected. *Id.* at 784-85. Second, the law required telefunders to disclose to donors the percentage of revenue the telefunder had retained from the charity over the past twelve months. *Id.* at 786. And third, it required telefunders to obtain a license before engaging in solicitation, while volunteer fundraisers encountered no such hurdle. *Id.* at 786-87.

As an initial matter, we reemphasize that the North Carolina law in *Riley* was not seeking to protect consumer privacy, but was rather "[r]esponding to a study" that indicated a growing trend of large commissions being charged by charity telefunders. *Id.* at 784. The Supreme Court was candid that an interest in keeping donors informed about how their charitable dollars are spent "is not as weighty as the State asserts." *Id.* at 798. *Riley* did not consider how restraints on charitable solicitations might further domestic privacy — a concern to which the Court has attached particular significance — and a concern that clearly motivated the agency here. It is thus difficult to compare *Riley* to the present case because, since the proffered state interests are not the same, the "narrowly tailored" analysis will necessarily differ.

Nonetheless, we note other significant differences between the TSR and the prohibitions in the North Carolina statute. Indeed, the regulations in *Riley* were far more restrictive than the ones before us today. The FTC has not asked the telefunders to obtain a license here, particularly not by a licensing procedure that could permit "a delay without limit." *Id.* at 802. Further, the TSR disclosure requirement — designed only to identify quickly the nature and purpose of the call — is much more modest than an obligation to reveal how much one is being paid for the call. *Id.* at 786. Not only does the latter require-

ment compel more speech, but it also adversely affects how receptive a listener will be to the remainder of what is said.

Finally, the TSR does not use a rough "percentage-based measure" to determine whether a telefunder's fee is reasonable or not. *Id.* at 793. Indeed, no limitation is placed on the amount of the telefunder's fee at all. Telefunders must comply, of course, with rules governing the manner in which they may call potential donors. But in this regard, they are no different from all other telmarketing companies regulated by the FTC. And the restraints that the FTC requires — by rationing calls rather than by prohibiting speech — are markedly different from the unconstitutional restraints in *Riley*. The *Riley* Court itself noted that "more benign and narrowly tailored options are available." *Id.* at 800. The FTC's new rule provides an example of just such an option.

### C.

We thus find the TSR restrictions to be modest, reasonable, and quite different from the laws invalidated in the three main Supreme Court cases governing this field. The plaintiffs make an additional argument, however, for why the TSR is not "narrowly drawn" to serve the two government interests at stake. *Munson*, 467 U.S. at 961. Their argument rests on an allegedly impermissible dichotomy between the way the FTC treats professional fundraisers and the way it treats in-house charity callers. As we have noted, the challenged restrictions apply to the former, but not the latter — adversely affecting those charities that choose to out-source their fundraising work. According to the plaintiffs, this distinction makes the TSR unconstitutionally "underinclusive."

A law is underinclusive in this sense, and thus not narrowly tailored, when it discriminates against some speakers but not others without a legitimate "neutral justification" for doing so. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-30 (1993). Even when the government has a compelling interest for restricting speech, it may not seek to further that interest by creating arbitrary distinctions among speakers that bear no "reasonable fit" to the interest at hand. *Id.* at 416-47. Thus, in *Discovery Network*, the government was prevented from advancing an interest in street aesthetics by

banning only newsracks containing commercial handbills, but not other publications. *Id.* at 425-26. The Court remarked that all news-racks are "equally unattractive" and it found suspicious the fact that the city's selective ban only eliminated 62 of the nearly 2000 racks. *Id.* at 418, 425. Put simply, as *Discovery Network* illustrates, a regulation can violate the First Amendment by restricting too little speech, as well as too much.

The concept of underinclusiveness needs to be approached with some caution, however. Holding an underinclusive classification to violate the First Amendment can chase government into overbroad restraints of speech. Thus, a speech restriction with a limited reach is not doomed to fail First Amendment scrutiny. *See Burson*, 504 U.S. at 207 ("We do not . . . agree that the failure to regulate all speech renders the statute fatally underinclusive.") What concerned the Court in *Discovery Network* was not, as the plaintiffs would have it, simply the fact that some speakers were restrained where others were not. Rather, the Court invalidated the ordinance because there was "no justification for that [distinction] other than the city's naked assertion that commercial speech has 'low value.'" *Id.* at 429.

There are other cases, by contrast, where an underinclusive speech restriction is justified by a neutral and legitimate reason for the distinction. In *Members of City Council of Los Angeles v. Taxpayers for Vincent*, for example, a city ordinance banned signposts only on public but not private property. 466 U.S. 789, 811 (1984). Although obviously underinclusive, the distinction was neutrally justified by a "private citizen's interest in controlling the use of his own property." *Id.*

As the district court in the present case noted, the Supreme Court has found an underinclusive restriction of speech to be impermissible in three circumstances: (1) where the law represents an attempt by the government to give one side of a public debate an advantage over another, *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994); (2) where the regulation is so broad or narrow in scope that it "undermines the likelihood of a genuine governmental interest," *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 396 (1984) (citation omitted); and (3) where the underinclusiveness is so severe that it "raises serious doubts" about whether the government is actually serving the

interests it invokes. *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989); *see also Discovery Network*, 507 U.S. at 424-26.[5]

Significantly, in all three scenarios the limited scope of the regulation served as a red flag to signal a governmental trespass on a fundamental First Amendment concern. A distinction among speakers is thus not objectionable per se, but only because it renders implausible the government's claim that the regulation making this distinction is narrowly tailored to address a certain interest. The *City of Ladue* Court, for instance, was troubled by the distinction in that case because it "diminish[ed] the credibility of the government's rationale for restricting speech." 512 U.S. at 51. Similarly, the *Discovery Network* Court did not invalidate the ordinance simply because it applied to some newsracks and not to others, but rather because the selective application of the ban left the city relying on the notion that commercial handbills were "low value," a characterization that the Court was "unwilling" to countenance. 507 U.S. at 428. *See also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 511 (1981) (framing the underinclusiveness question by asking whether "the city denigrates its interest . . . and defeats its own case by permitting" some speech and not others).

There is no mystery, however, about why the FTC has distinguished telefunders from in-house charity callers. Indeed, the agency candidly explained that it drew this line because that was the only way to reconcile the new instructions from Congress set forth in the

---

[5]The dissent reads *Riley* to create yet another category, one that would require "a compelling justification" for "regulations that distinguish between charities." Dissenting Op. at 30. But *Riley* cannot bear the weight that the dissent would place upon it. The "key deficiency" of the North Carolina statute was not, as the dissent would have it, the fact that "it necessarily only applied to those charities that used professional fundraisers." *Id.* at 30. Rather, the problem was that the provision could not withstand "exacting First Amendment scrutiny" because the state's interest was insufficiently "weighty" and "the means chosen to accomplish it [were] unduly burdensome and not narrowly tailored." *Riley*, 487 U.S. at 798. As we have noted, the *Riley* Court emphasized that imposing requirements upon professional fundraisers does not offend the First Amendment so long as those requirements are sufficiently narrowly tailored, *id.* at 799 n.11, as the restrictions in this case are.

PATRIOT Act with the old, unchanged instructions from Congress set forth in the Telemarketing Act. Thus, the agency noted that:

> Reading the amendments to the Telemarketing Act effectuated by § 1011 of the USA PATRIOT Act together with the unchanged sections of the Telemarketing Act compels the conclusion that for-profit entities that solicit charitable donations now must comply with the TSR, although the Rule's applicability to charitable organizations themselves is unaffected.

*See* 68 Fed. Reg. 4580, 4585 (January 29, 2003). This reconciliation of the two statutes, as the lower court explained, is "[t]he only logical conclusion that can be drawn from reading these two provisions together." *See Nat'l Fed. of the Blind*, 303 F. Supp. 2d at 714. And it is thus no surprise that the agency reached it.

In fact, when it announced the TSR, the FTC specifically responded to comments it had received from charities claiming that this interpretation of Congress' instructions created "a double standard" — increasing costs for only those charities who choose to use telefunders and not for those charities who do not. In response, the FTC explained:

> Again, the Commission notes that despite its broad mandate to regulate charitable solicitations made via telemarketing, the USA PATRIOT Act amendments did not expand the Commission's jurisdiction under the TSR to make direct regulation of non-profit organizations possible.
>
> . . .
>
> . . . the jurisdictional reach of the Rule is set by statute, and the Commission has no authority to expand the Rule beyond those statutory limits.

*See* 68 Fed. Reg. at 4586, 4587.

The dissent finds itself unable to accept the distinction between paid solicitors and in-house volunteers. It rejects the view that tele-

funders, presumably on commission, will more aggressively pursue residents because "[u]nlike the FTC, [the dissent] cannot accept that one's strongest motivations are always monetary." Dissenting Op. at 32 n.2. Whether or not one accepts the view that paid solicitors are more likely to hound residents for money, the question before us is not a matter of substantial evidence review of an agency decision, but rather a question of whether we have an adequate basis in law for finding the TSR to be unconstitutional. No such basis exists.

The distinction of which appellants complain was something the agency was bound to make by simple application of its jurisdictional limitations. And, what is more, drawing this sort of line is not a new enterprise for the FTC. The agency has made distinctions in the past — analogous to the one challenged here — with regard to telemarketing done on behalf of other entities outside its jurisdiction. The introduction to the TSR explains:

> The Commission notes that, from the inception of the Rule, the Commission has asserted that parties acting on behalf of exempt organizations are not thereby exempt from the FTC Act, and thus, for example, a nonbank company that contracts with a bank to provide telemarketing services on behalf of the bank is covered by this Rule. This reading is consistent with the Commission's long-standing interpretation of the scope of its authority under the FTC Act, as well as with judicial precedent.

68 Fed. Reg. at 4586 (quotation marks omitted).

When an agency regulates to the extent of its jurisdiction it will unavoidably leave out some speakers and some speech that is beyond its authority to regulate. But, in such circumstances, the danger of governmental overreaching — which cases such as *Discovery Network* aim to prevent — is removed. Unlike in those cases, here it does not make sense to see this unavoidable distinction as a red flag indicating First Amendment problems. Any underinclusiveness that appellants have identified is not the result of the FTC attempting to favor one side of a public debate over another, *City of Ladue*, 512 U.S. at 51, or pursuing an illegitimate governmental interest, *League of Women Voters*, 468 U.S. at 396, or not genuinely serving the inter-

est it purports to seek, *Florida Star*, 491 U.S. at 540. Rather, such underinclusiveness results from the simple fact that the PATRIOT Act designated "charitable solicitations" as being within the type of behavior the FTC could regulate, but it left speech by charities outside the agency's jurisdiction.

The agency's jurisdictional boundary, therefore, serves as the "neutral justification" for the distinction that was missing in *Discovery Network*. *See* 507 U.S. at 429-30. While plaintiffs complain that the regulation also fails to cover some commercial, political, and intrastate speech, this fact too is explained by the FTC's assiduous attention to its own jurisdiction.

Appellants' argument suffers from another flaw. They ask us to hold that the FTC's distinction, based on the clear congressional directives governing its jurisdiction, is unconstitutional. But if we did so, then any regulation by any federal agency that applied to only some speakers would be imperiled. Worse still, Congress could not remedy such defects by re-assigning jurisdiction among agencies. For the reassignment would itself necessarily distinguish among speakers or speech that each agency can regulate. This is so because jurisdiction, by its very nature, is underinclusive. The upshot of appellant's position is thus a stark choice for lawmakers — either assign all regulation touching on speech to one federal agency, or do not regulate at all. We do not believe the Constitution hamstrings Congress in such a manner.

In any event, effectively instructing Congress to reorder an agency's jurisdiction would be an unwarranted exercise of judicial authority. Agency jurisdiction often reflects traditional areas of expertise and experience which extend well beyond this or indeed any single problem. *See Weinberger v. Bentex Pharm. Inc.*, 412 U.S. 645, 654 (1973) (emphasizing agency "specialization" and specific "insight gained through experience"). Congress has a great deal on its plate, and it is neither wise nor within our competence as judges to casually direct the legislative branch to re-organize executive agencies.[6]

---

[6]In this regard, we do not find it surprising that different agencies might adopt different policies. The point has been made that the FCC,

Our fine dissenting colleague takes to task the FTC's action because it offends the all-or-nothing way in which the dissent believes the government should operate. In the dissent's view, government is not entitled to messy or untidy solutions, but instead is confined to sweeping pronouncements, bereft of the ability to make distinctions or to strike compromises. This is a view that we cannot accept. Indeed, we note that accepting plaintiffs' underinclusiveness arguments would strike a blow to the democratic process and our structure of government. We have no warrant to prevent the government from addressing a problem one step at a time. And, if we were to strike down these regulations as underinclusive, we could well provoke legislatures to pass broader regulations that would prove far more damaging to free speech. We thus need not prevent the government from confronting problems incrementally; to do so would ignore the warning that the government is not required to "make progress on every front before it can make progress on any front." *See United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993).

## VI.

The same respect for the democratic process that leads us to credit the FTC for faithfully applying its jurisdictional mandate counsels respect for the obvious efforts the agency has taken to balance the competing interests involved. Indeed, were we not to respect the compromises made by the agency, we would be depriving our legislative and executive branches of the authority to protect residential privacy even to the modest extent that these regulations do.

A brief review of the TSR underscores its status as a series of compromises. The regulations do not, for instance, prohibit telemarketing

when interpreting the Telephone Consumer Protection Act, exempted all charitable speech from its regulation and did not distinguish telefunders from in-house charity callers. We note that the two agencies are operating with different jurisdictional boundaries and are interpreting different statutes. In any event, the fact that two agencies disagree with each other is hardly remarkable. For such variance is commonplace in government. The mere fact of agency disagreement does not suggest to us that one or the other view is unconstitutional.

altogether — only early morning and late night calls are disallowed. Neither do the regulations require a cumbersome and lengthy disclosure of identifying information — only the name of the charity represented and the purpose of the call must be disclosed. Furthermore, the regulations do not subject telefunders to the more restrictive national do-not-call list — instead they must only comply with a charity-specific registry.

Indeed, the agency's compromises are explicitly recognized in the TSR itself. Aware of *Riley*, *Schaumburg*, and *Munson*, the Commission properly noted the importance of "minimz[ing] the impact on the First Amendment rights of charitable organizations and the telemarketers who solicit on their behalf." 68 Fed. Reg. at 4636. The agency was explicitly sensitive to the fact that smaller charities tend "to employ for-profit firms to make their calls." *Id.* at 4666. Because of this, the FTC was concerned that subjecting telefunders to a national do-not-call list would "sweep too broadly," *id.* at 4636, and it thus settled on a "more limited approach" requiring telefunders to honor only a charity-specific do-not-call list. *Id.* at 4637. This compromise, it noted, was "likely to be of significant benefit to smaller charities," *id.* at 4666, and "work[ed] better to accommodate both the right of privacy and the right of free speech." *Id.* at 4637.

These regulations are, in short, the product of a necessary balancing. The rights of charities and telefunders to communicate with potential donors were weighed against the right of those donors to enjoy residential peace. In this respect, the regulations are akin to the numerous time, place, and manner restrictions on speech that the Supreme Court has often upheld against First Amendment challenge. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 803 (1989). Just as those restrictions balance the government's interest in protecting the community, *see id.* at 796, against a speaker's right to disseminate his ideas, *see id.* at 802 (regulation must "leave open ample alternative channels of communication"), so do the FTC's restrictions on telemarketing accomplish such a reconciliation of personal and public interests.

The dissent analogizes what took place here to a decision by Congress to assign a particular agency jurisdiction over speakers with a particular political orientation or point of view. Dissenting Op. at 34-

35 (discussing hypothetical agency jurisdiction "over one political party"). This analogy is so far afield from the neutral character of the jurisdictional division here as to be apples and oranges. Like time, place, and manner restrictions, the TSR provisions do not exhibit any disapproval of the content of the calls placed by telefunders. The TSR applies evenhandedly to solicitations for charities of all persuasions and beliefs. The restrictions apply to all telemarketing calls made by entities within the FTC's jurisdiction, regardless of the subject matter of the call or the viewpoint expressed by the caller. "[L]aws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994). And narrowly-drawn content-neutral restraints on speech represent a permissible governmental response to a legitimate and substantial public concern. *See Ward*, 491 U.S. at 798-99.

Compromises of this sort are critical to a government of separated powers. They permit all three branches to participate in striking a balance between individual rights on the one hand and public interests on the other. The judicial branch identifies a constitutional right (as in *Riley*), and then the executive and legislative branches reconcile respect for that right with a measured protection of the public interest. We should be wary of upsetting such a delicate dance in which all three partners of government play their distinctive roles.[7] Courts have their vital part to play, but here it is best performed in conjunction with, and not to the exclusion of, the coordinate branches of our government.[8]

---

[7]Admittedly, the FTC is often called an "independent agency" and is not fully accountable to the executive branch. However, the FTC acted pursuant to an explicit congressional directive, *see* 15 U.S.C. § 6102(a)(1), and it conducted hearings giving ample opportunity to interested parties to voice concerns within this congressional rubric. *See* 68 Fed. Reg. 4580, 4582 (Jan. 29, 2003). It thus reflects the efforts of our democratic branches.

[8]The charities additionally claim that the TSR constitutes an impermissible prior restraint of speech, and violates the Equal Protection Clause. We find these arguments to be without merit.

First, as the district court noted, plaintiffs' prior restraint argument "ignores the long-held distinction between prior restraints and subsequent

## VII.

Our Constitution does not prevent the democratic process from affording the American family some small respite and sense of surcease. We hold, therefore, that the FTC was authorized by Congress to promulgate the TSR, and we find that the rule is consistent with the First Amendment. Since it is "narrowly drawn" to serve the "strong subordinating interest" of protecting residential peace, the TSR embodies a proper compromise between the important speech interests of charities and the equally important need to protect the public from excessive intrusions into the home. *Munson*, 467 U.S. at 960-961. The district court's judgment is accordingly

*AFFIRMED*.

DUNCAN, Circuit Judge, dissenting:

There are few more annoying occurrences than the disruption of one's sleep due to a late-night or early-morning phone call by a telephone solicitor. Whether the end result is simply mild frustration (due to an ill-timed solicitation) or actual fear (due to the phenomenon of "abandoned calls"), the invasion of privacy that the majority identifies due to unwanted telephone solicitations is certainly a compelling interest that government can seek to remedy. I do not disagree with the majority's assessment that the regulations at issue in this case are modest attempts by the Federal Trade Commission ("FTC") to provide some respite to the public from the barrage of such intrusions. Were these regulations to apply equally to all charities that seek to engage in telephone solicitations, I would concur in the majority's

---

punishments." *Nat'l Fed. of the Blind v. FTC*, 303 F. Supp. 2d 707, 723-24 (D. Md. 2004). Traditionally, unconstitutional prior restraints are found in the context of judicial injunctions or a licensing scheme that places "unbridled discretion in the hands of a government official or agency." *FW / PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990). Here, by contrast, it is only after the speech is uttered that a violation of the TSR can occur and sanctions can be imposed.

Second, there is no Equal Protection violation for the same reasons there is no First Amendment violation. *See Nat'l Fed. of the Blind*, 303 F. Supp. 2d at 723.

decision to affirm. However, because the TSR in my view impermissibly distinguishes between the type of speech permitted based upon the identity of the speaker without any legitimate neutral justification, I must unfortunately, respectfully, dissent.

I.

As the majority correctly points out, a law or regulation is underinclusive when it restricts the speech of one group of speakers but not that of another similarly situated group without a legitimate "neutral justification" for the distinction. *See City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429-30 (1993). Even where, as here, the government has a compelling interest in regulating a particular type of speech, its distinctions between similarly situated actors must reflect a "reasonable fit" between the restriction and the goal to be achieved by the disparate treatment. *Id*. At 417. If the distinction restricts speech in a way that does not achieve its stated goal, or is made without sufficient evidentiary justification, the regulation is constitutionally underinclusive.

In *Riley v. Nat'l Fed. Of the Blind of North Carolina, Inc.* 487 U.S. 781 (1988), the Supreme Court made clear that the two groups at issue here, charities that use "telefunders" and those that keep solicitation in-house, are similarly situated actors. *Riley* involved a North Carolina statute requiring all professional fundraisers to disclose to potential donors the percentage of the charitable contributions collected in the previous twelve months that was actually turned over to the charity. *Id*. at 784 n.2. The Supreme Court struck down the requirement, holding that the state's interest in informing donors about the charity's fundraising agreement did not outweigh the fundraisers' significant speech interests. *Id*. at 798-99.

Most importantly for our purposes, the Court noted that the statute's key deficiency was that it necessarily only applied to those charities that used professional fundraisers. *Id*. at 784. The Court recognized that in addition to the heightened scrutiny given to all regulations affecting charitable solicitations, courts should be especially cognizant of the comparative effect regulations that distinguish between charities based upon the professional/volunteer status of the solicitor can have on the success of the charity itself. *See id*. at 799.

Because charities using professional solicitors are likely to be smaller and less popular than those relying on in-house efforts, the statute's application of the financial disclosure requirements to these professional fundraisers would place them at a competitive disadvantage. The state in *Riley* argued that even under this heightened scrutiny, its regulation was justified due to the increased risk of fraud inherent in telefunder solicitation. The Court specifically rejected this assertion, holding that there exists "no nexus" between the percentage of funds retained by a solicitor and the likelihood of fraud. *Id.* at 793. Because regulations that distinguish between charities can affect the financial success of one vis a vis another, such distinctions must have a compelling justification. With no evidence to support the state of North Carolina's bald assertion of a greater likelihood of fraud, the court held that the state could not treat these similarly situated actors differently, and the distinction could not be upheld. *Id.* at 798-99. It is against this backdrop that we must review the regulation now before us.[1]

The FTC asserts that it intended the amended TSR to further the dual goals of fraud protection and consumer privacy. However, it is unclear that either of these goals is advanced in any material way by the TSR's inclusion of only solicitations made by telefunders rather than the broader category of all charitable solicitors in its speech restrictions. The district court found sufficient the FTC's declaration that a professional telefunder's financial interest in obtaining greater contributions leads it to be more likely to engage in fraudulent behavior than a non-professional solicitor. *Nat'l Fed. of the Blind v. F.T.C.*, 303 F. Supp. 2d 707, 721 (D. Md. 2004). However, the FTC, when pressed at oral argument, conceded that there existed "*no empirical evidence*" in the administrative record to support this assumption. In fact, the FTC conceded that the only evidentiary support the agency had for solely applying the TSR to telefunders was its intuitive, "common-sense" assumption that telefunders commit fraud more frequently. This is the exact assumption rejected by *Riley*. Further, as it

---

[1]In its well-reasoned opinion, the majority considers *Riley* but does not address its implications concerning underinclusiveness. While the regulations at issue here may be more limited than in *Riley*, there is no indication that its holding that charities are similarly situated actors that must be treated equally without compelling justification is any less applicable.

is not grounded on any fact that the FTC or this court has before it, I cannot accept it as a "neutral justification" for the speech limitation distinction.[2]

The same evidentiary deficiencies undercut the FTC's conclusion that its regulations advance the goal of protecting consumer privacy. While it cannot be doubted that the government's rules will prevent some degree of consumer annoyance, the FTC again presents *no evidence* that telefunders are more likely to be violators of consumer privacy or engage in abusive telemarketing practices than in-house solicitors. There is *no suggestion* in the record that consumers are more likely to feel that their privacy is invaded when receiving a call from a telefunder than a volunteer or in-house employee of a charitable organization. The FTC has also provided *no evidence* showing that telefunders generate a majority, or even a significant percentage of the charitable solicitation calls. It is not enough for us to accept the agency's rationale that the regulation is justifiable because it will help consumers in some small way. *See Discovery Network*, 507 U.S. at 426 (1993)(holding that a selective ban on commercial newsracks was not justifiable simply because it would "in some small way limit the total number of newsracks."). In order for it to pass the underinclusiveness test, the FTC must show that the evidence illustrates that it makes sense to treat these similarly situated charities differently. This it does not do.

---

[2]The majority is correct in asserting that our review is not one for "substantial evidence," but rather is a question as to whether we have a substantial basis for finding the regulation unconstitutional. Majority Op. at 24. Here we most certainly do. The lack of evidence (as opposed to "common-sense" assumptions) providing a "neutral justification" for the distinction between telefunders and in-house solicitors requires the finding of a First Amendment violation.

Further, even if such so-called "common sense" assumptions were a sufficient evidentiary basis for speech distinctions (and *Discovery Network* counsels that they are not), I would not accept this one. It could just as plausibly be argued that a solicitation conducted by someone with a personal interest in the success of a charity (such as an employee or a volunteer) may lead to more overreaching and thus a greater potential for fraud. Unlike the FTC, I cannot accept that one's strongest motivations are always monetary.

It is certainly not the case that the First Amendment requires the government to regulate all aspects of a problem before regulating any part of it. *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993). We generally give the government the latitude it needs to find ways to address problems in society in the manner in which it sees fit, and those judgments are deserving of deference.[3] However, where, as here, no evidentiary basis has been articulated for the disparate treatment of similarly situated groups, such deference is unwarranted. *See Florida Star v. B.J.F.*, 491 U.S. 524, 537-38 (1989). The FTC has made no showing that the professional/non-professional distinction it employs in the TSR furthers the goals of fraud prevention and consumer privacy. It is this showing that *Discovery Network's* "neutral justification" and "reasonable fit" requirements compel. 507 U.S. at 428-30. Because these requirements are not satisfied, the TSR cannot survive.

The majority characterizes my analysis as reflecting a belief that government must act in an "all-or-nothing" manner. It asserts that I believe that the government cannot undertake "messy" solutions, but rather must only make "sweeping pronouncements." Majority Op. at 26. It is unclear to me how such broadly painted assumptions about my beliefs concerning the role of government could be ascertained from such a narrow dissent; in any event, nothing could be further from the truth. Rather, I simply believe that the Supreme Court meant what it said in *Discovery Network* that without a "neutral justification," neither Congress nor executive agencies can create speech restrictions that treat similarly-situated actors differently. 507 U.S. at 428-30. The FTC had ample opportunity during the rule-making process to create an evidentiary record to support the distinction it has drawn. It failed to do so, and the majority's mischaracterization of my views and expressions of concern for the "democratic process" and "our structure of government" are no substitute. The government is

---

[3]The majority's deference borders on subservience. By suggesting that after the judiciary finds a constitutional right, as in *Riley*, it is then up to the legislative and executive branches to define the scope of that right, the majority seems to suggest a far too limited role for the courts. However the "elaborate dance" between the governmental branches is to proceed, the judiciary cannot relinquish its role as the ultimate protector of constitutional guarantees.

certainly able to "make distinctions or to strike compromises," Majority Op. at 26, but in doing so, it must abide by the First Amendment. Here, the FTC did not.

## II.

Seeking to save the FTC from these evidentiary deficiencies, the majority holds that the distinction the TSR draws between in-house fundraisers and external telefunders is justified due to the agency's jurisdictional restraints. The FTC Act gives the agency jurisdiction over "persons, partnerships and corporations," but no authority over nonprofit organizations. 15 U.S.C. § 45(a)(2). The majority correctly notes that without the jurisdiction to regulate all nonprofit organizations, the FTC has no ability to correct the underinclusiveness inherent in the TSR. According to the majority, some degree of underinclusiveness is inevitable in all agency regulation, and an agency's jurisdictional boundaries can therefore serve as the "neutral justification" for an underinclusive distinction.

The implications of this holding are staggering. If a regulation that places different restrictions on speech based upon the identity of the speaker can be upheld simply by relying on the jurisdiction of the agency as the "neutral justification" for the distinction, this court will have created a perverse incentive for all legislative bodies. Congress can restrict speech, even unconstitutionally, so long as it does so by parsing jurisdiction between various agencies. If, for example, Congress were to give a particular agency jurisdiction over one political party — for instance if the Department of Homeland Security were given jurisdiction over the Independent party in America — the majority's holding would allow a regulation that restricted that party's ability to raise funds to be upheld simply by referring to the agency's jurisdiction.[4] Restrictions on speech that go to the heart of the First

_____

[4]The majority criticizes this analogy without providing any basis for distinguishing it from the situation before us. The government could disperse jurisdiction over political parties among various agencies without "exhibit[ing] any disapproval of the content" of the parties' messages. *See* Majority Op. at 28. If one of such agencies were then to create a set of restrictions that apply to all parties within its jurisdiction, and "impose burdens on speech without reference to the ideas or views expressed,"

Amendment, those differentiating solely on the identity of the speaker, would be given little to no scrutiny, as the legislative decision to disperse jurisdiction amongst various executive agencies would justify the disparities. The majority would allow Congress to do indirectly that which it cannot do directly, and that is to regulate speech in an underinclusive manner.

The majority's sole focus on the FTC's jurisdiction and that agency's inability to promulgate an even-handed regulation overlooks the fact that Congress is well able to correct the constitutional deficiency.[5] In this case it could have done so by simply expanding the FTC's jurisdiction to include all charitable solicitations, thus authorizing the agency to pass a regulation that advances the goals of fraud protection and consumer privacy materially and constitutionally. Congress could have also simply required the Federal Communications Commission, the agency with oversight authority over all non-telefunder charitable solicitation, to pass a similar regulation, thus insuring that all charities were on a level playing field in their quest to solicit funds. However what it cannot do is hide behind jurisdictional barriers which it erected as a shield for its unconstitutional restrictions on speech based upon the identity of the speaker.[6]

---

the majority's reasoning would require us to uphold the restriction. Significantly, the majority is unable to point to any language in its opinion which would preclude such a result. The majority's unexplained assertion that my analogy is "so far afield" from the regulation at hand as to be "apples and oranges" reflects a conclusion rather than an analysis.

[5]The majority suggests that a "correction" by Congress of an agency's jurisdiction would in and of itself, be underinclusive. However it posits no basis for this proposition. If true, all Congressional grants of jurisdiction that differentiate between groups would be underinclusive. The First Amendment does not require this radical result; it simply requires some legitimate basis for differential treatment.

[6]The majority's concern about judicial overreaching is understandable but inapplicable here. If Congress and the executive agencies have evidentiary reasons for their respective decisions to pass regulations that have the effect of treating similar groups differently, they may well pass constitutional muster. However when, as here, no such evidentiary basis exists, the effect of this Congressional choice is to create an unconstitutional restriction on speech. It is not overreaching to prevent this result.

III.

The Supreme Court has recognized that the ability to raise funds is the lifeblood of a charity. *Riley*, 487 U.S. at 789. For very large or very popular charities, fundraising can be conducted in-house through employees of the charities or volunteers. The use of volunteers can even be a selling point to potential donors, as an individual's willingness to dedicate his or her free time to a cause suggests a strong belief in its goals. However, for small or unpopular charities, the ability to engage in mass volunteer fundraising may be impossible, and thus the use of professional fundraisers may hold the key to the entity's existence.

As charities compete for the finite charitable donation dollar, those charities that either choose to or are forced to use telefunders are placed at a competitive disadvantage by the regulations that affect them and not their charitable counterparts. It may very well be the case that following the regulations laid down in the TSR would be a good practice for all charities. Calling consumers early in the morning or in the middle of the night appears unlikely to provide the most successful fundraising strategy. However, whatever decisions the individual charities make, *Riley* and *Discovery Network* compel the conclusion that the government must apply an even hand. The FTC has no evidence and no reason beyond jurisdictional authority justifying its decision to regulate charitable solicitations differently based upon the identity of the speaker.

The majority holds that this suffices, and that Congress can justify unconstitutional restrictions on speech based upon the identity of the speaker simply by delineating jurisdiction over those speakers between various executive agencies. This argument is untenable. It provides a jurisdictional loophole through which government can achieve indirectly that which it cannot do directly. I do not believe that such jurisdictional parsing can be a "neutral justification" for a regulation that imposes different speech restrictions based upon the identity of the speaker. I therefore respectfully dissent.