# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-3848

_____

Fraternal Order of Police, North Dakota    *
State Lodge; Veterans of Foreign Wars,  *
Department of North Dakota,    *
   *
      Appellees,    *
   *
   v.    *
   *
Wayne Stenehjem, in his official    *
capacity as Attorney General of the    *
State of North Dakota,    *  Appeals from the United States
   *  District Court for the
      Appellant.    *  District of North Dakota.
   *
   *
_____    *
   *
State of Indiana; State of Alaska; State    *
of Idaho; State of Illinois; State of Iowa;  *
State of Maine; State of Maryland;    *
State of Missouri; State of Nevada;    *
State of Ohio; State of South Dakota;    *
State of Tennessee; State of Vermont;    *
State of Wisconsin; State of Wyoming;    *
   *
      Amici on behalf of    *
      Appellant,    *
   *
Alabama Sheriffs Association; Alabama  *
Jaycees; Alabama Peace Officers    *
Association; American Association of    *
State Troopers, Inc.; American Ex-    *
Prisoners of War Service Foundation,  *

Inc.; American Legion, Department of Alabama; American Legion, Department of Florida; American Legion, Department Georgia; American Legion, Department of Illinois; American Legion, Department of Texas; American Legion, Department of Wisconsin; American Legion, Department of Wyoming; Amvets American Veterans; Department of Florida; Department of Iowa; Amvets, Department of Massachusetts; Amvets, Department of New Jersey Service Foundation; Amvets, Department of Wisconsin; Anne Arundal County (MD) Fire Fighters, Local 1563; Arizona Narcotic Officers Association; Arizona Paralyzed Veterans Association; Associated Fire Fighters of Arizona; Association of Oklahoma Narcotic Enforcers; Associated Fire Fighters of Illinois; Baltimore County (MD) Professional Fire Fighters Association; Broward County (FL) Police Benevolent Association; California Narcotic Officers Association; California Professional Firefighters; California Peace; California Reserve Peace Officers Association; California Veterans Assistance Foundation, Inc.; Cancer Fund of America; Chatham County (GA) Police Association, Inc.; Chattanooga (TN) Firefighters Association, Local 820; Clarksville (TN) Fire Fighters Association; Colorado Jaycees; Colorado State Firefighters Association; Colorado

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

State Lodge, Fraternal Order of Police; *
Colorado Vietnam Veterans, Inc.; *
Committee for Missing Children; *
Concord (NC) Professional Fire Fighters *
Association; Connecticut Vietnam *
Veterans; Crime Stoppers, Inc. (MN); *
Dade County (FL) Fire Fighters; Dade *
County (FL) PBA; Delaware-Maryland *
Paralyzed Veterans; Department of *
Kansas, Veterans of Foreign Wars; *
Department of Kentucky, Veterans of *
Foreign Wars; Department of Michigan, *
Veterans of Foreign Wars; Department *
of Montana, Veterans of Foreign Wars; *
Department of Nebraska, Veterans of *
Foreign Wars; Department of Nevada, *
Veterans of Foreign Wars; Department *
of New York, Veterans of Foreign Wars; *
Department of South Dakota, Veterans *
of Foreign Wars; Department of *
Washington, Veterans of Foreign Wars; *
Disabled American Veterans, *
Department of Washington; Firefighters *
Charitable Foundation; Florida *
Association of Professional EMTs and *
Paramedica; Florida Fire and Emergency *
Services Foundation; Florida Highway *
Patrol Command Officers Association; *
Florida Law Enforcement Games; *
Florida Professional Fire Fighters; *
Foundation of Iowa Jaycees Charities; *
Georgia State Fire Fighters Association; *
Georgia Association of EMTs, Inc.; *
George State Lodge, Fraternal Order of *
Police; Hawaii State Fire Fighters *
Association; Idaho Sheriffs Association; *
Illinois Police Association; Illinois *

Vietnam Veterans, Inc.; Indiana      *
Association of Chiefs of Police;      *
Indiana Association of Chiefs of Police      *
Foundation; I; International Law      *
Enforcement Games; Iowa Professional      *
Fire Fighters; Iowa State Peace Officers      *
Council; Iowa State Police Association;      *
Iowa State Reserve Law Officers      *
Association; Kansas Jaycees; Kansas      *
Peace Officers Association; Kansas      *
Sheriffs Association; Kansas State      *
Council of Fire Fighters; Kentucky      *
Professional Fire Fighters; Kentucky      *
State Police Professional Association;      *
Lexington (NC) Fire Fighters      *
Association, Local 3064; Lisle-      *
Woodridge Fire Fighters Union;      *
Maryland and District of Columbia      *
Professional Fire Fighters Association;      *
Maryland Sheriffs Association;      *
Massachusetts Foundation for the      *
Advancement of Vietnam Veterans;      *
Michigan Jaycees; Michigan State      *
Lodge, Fraternal Order of Police;      *
Mid-South Paralyzed Veterans      *
Association (TN, AR, MS); Military      *
Order of the Purple Heart Service      *
Foundation; Minnesota Chiefs of      *
Police Association; Minnesota Jaycees;      *
Minnesota State Lodge, Fraternal      *
Order of Police; Minnesota Professional      *
Fire Fighters; Minnesota State Patrol      *
Troopers Association; Missouri      *
Federation of Police Chiefs; Missouri      *
Jaycees, Inc.; Missouri State Council of      *
Fire Fighters; Missouri Vietnam      *
Veterans Foundation; Mobile (AL)      *

Fire Fighters Association; Montana *
Association of Chiefs of Police; *
Montana Jaycees; Montana Vietnam *
Veterans, Inc.; National Narcotic *
Officers Association Coalition *
NNOAC); Nebraska Jaycees; Nebraska *
Sheriffs Association; Nevada State *
Firefighters' Association; New *
Hampshire Jaycees; New Jersey Deputy *
Fire Chiefs Association; New Jersey *
Vietnam Veterans, Inc.; New Mexico *
Sheriffs & Police Association; New *
York Association PBA, Inc.: New York *
State Union of Police Associations *
(AFL-CIO); New York Vietnam *
Veterans Foundation; North Dakota *
Jaycees; North Dakota Vietnam *
Veterans of America; Ohio Association *
of Emergency medical Services; Ohio *
Council of Police Safety Associations; *
Ohio Jaycees; Ohio Troopers Coalition, *
Inc.; Oklahoma Association of Chiefs *
of Police; Oklahoma Sheriffs and Peace *
Officers Association; Oklahoma *
Vietnam Veterans Charitable *
Foundation, Inc.; Palm Beach County *
(FL) Council of Fire Fighters and *
Paramedics; Peace Officers Association *
of Georgia, Inc.; Pennsylvania *
Professional Fire Fighters Association; *
Police Athletic League of New Jersey; *
Police Officers Association of Michigan;*
Police Officers Defense Fund of New *
York State, Inc.; Professional Fire *
Fighters of Alabama; Professional Fire *
Fighters of Georgia; Professional *
Firefighters of Greensboro (NC); *

Professional Fire Fighters of Oklahoma; *
Professional Fire Fighters & Paramedics *
of North Carolina; Professional Fire *
Fighters of North Dakota; Professional *
Fire Fighters of South Dakota; *
Professional Fire Fighters of Vermont; *
Professional Fire Fighters of West *
Virginia; Professional Fire Fighters of *
Wisconsin; Professional Fire Fighters *
Union of Indiana; Raleigh (NC) *
Professional Fire Fighters, Local 548; *
Rhode Island Vietnam Veterans of *
America, Inc.; Roanoke (VA) Fire *
Fighters Association; Rock Hill (SC) *
Fire Fighters Association; Rockford *
City (IL) Fire Fighters Union IAFF, *
Local #413; Salem (VA) Professional *
Fire Fighters Association, Local #3478; *
South Dakota State Lodge, Fraternal *
Order of Police; South Dakota Peace *
Officers Association; South Florida *
Council of Fire Fighters; Southeastern *
Paralyzed Veterans Association (GA, *
NC); Southwest Florida Professional *
Fire Fighters and Paramedics; State of *
Florida Association of Police Athletic/ *
Activities Leagues; State Peace Officers *
Council (NV); State Troopers *
Association of Nebraska; Tennessee *
Jaycees; Tennessee Vietnam Veterans; *
Texas Department of Pubic Safety *
Officers Association; Texas Police *
Chiefs Association; Tulsa (OK) Fire *
Fighters Local 176; Uniformed Fire *
Fighters of Connecticut; United *
Professional Fire Fighters Association *
of Connecticut; Veterans Assistance *

Foundation, Inc.; Veterans of Foreign    *
Wars, Department of Massachusetts;    *
Veterans of Foreign Wars, Department    *
of New Mexico; Vietnam Veterans    *
Buckeye Foundation, Inc.; Vietnam    *
Veterans Foundation of Georgia;    *
Vietnam Veterans of Iowa, Inc.;    *
Vietnam Veterans Foundation of Texas,    *
Inc.; Vietnam Veterans of Kentucky,    *
Inc.; Vietnam Veterans of Nebraska;    *
Vietnam Veterans of Virginia, Inc.;    *
Virginia Professional Fire Fighters;    *
Virginia State Firefighters Association;    *
Washington Jaycees; Washington State    *
Fire Fighters Association; Washington    *
State Law Enforcement Association;    *
West Virginia Chiefs of Police    *
Association; West Virginia Deputy    *
Sheriffs Association; West Virginia    *
Troopers Association; West Virginia    *
Vietnam Veterans Foundation;    *
Wisconsin Jaycees; Wisconsin Law    *
Enforcement Officers Association;    *
Wisconsin Sheriffs & Deputy Sheriffs    *
Association; Wisconsin Troopers    *
Association, Inc.; Wisconsin Veterans    *
Assistance Foundation,    *
   *
       Amici on Behalf of    *
       Appellee.    *

_____

No. 04-1619

_____

Fraternal Order of Police, North    *
Dakota State Lodge; Veterans of    *

Foreign Wars, Department of North                *
Dakota,                                           *
                                                  *
            Appellees,                                *
                                                  *
      v.                                              *
                                                  *
Wayne Stenehjem, in his official                  *
capacity as Attorney General of the               *
State of North Dakota,                            *
                                                  *
            Appellant.

_____

No. 04-1620

_____

Fraternal Order of Police, North                  *
Dakota State Lodge; Veterans of                   *
Foreign Wars, Department of North                 *
Dakota,                                           *
                                                  *
            Appellants,                               *
                                                  *
      v.                                              *
                                                  *
Wayne Stenehjem, in his official                  *
capacity as Attorney General of the               *
State of North Dakota,                            *
                                                  *
            Appellee.                                 *

_____

Submitted:  November 19, 2004
Filed:   December 7, 2005

_____

Before WOLLMAN and HEANEY, Circuit Judges, and HOLMES,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

## I.

This case involves a facial challenge to North Dakota Century Code Chapter 51-28 (the "Act"), which prohibits certain telephone solicitations of North Dakota residents who register with the state's "do-not-call" list. Plaintiffs are nonprofit organizations who rely on professional charitable solicitors for their fundraising.

The Act exempts telephone solicitations made by charitable organizations if "the telephone call is made by a volunteer or employee of the charitable organization" and the caller makes specified disclosures. N.D. Cent. Code § 51-28-01(7) (2003).[2] The Act thus distinguishes between "in-house" charitable solicitors and professional charitable solicitors. Further, the Act's restrictions apply only to telephone solicitation. See id. Under the Act, a charity may hire an outside agency to call registrants to advocate the charity's message, but that agency may not solicit the registrant to donate funds.

The district court invalidated a portion of the Act as a content-based regulation that failed strict scrutiny. The district court also awarded attorney's fees under 42

_____

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas, sitting by designation.

[2]The Act also exempts calls made with a resident's prior written consent; by or on behalf of any person with whom the resident has an established personal or business relationship; by or on behalf of pollsters unless the call is made through an automatic dialing-announcing service; by individuals soliciting without the intent to complete the solicitation on the phone but who will follow up with a face-to-face meeting; and by or on behalf of a political party, candidate, or other group with a political purpose. Id.

U.S.C. § 1988. North Dakota appeals from the invalidation of the Act, and the parties cross-appeal the award of attorney's fees. We reverse.

## II.

We review *de novo* the district court's grant of judgment on the pleadings as to the unconstitutionality of the Act. Potthoff v. Morin, 245 F.3d 710, 715 (8th Cir. 2001). Because professional charitable solicitation is fully protected speech, see Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc., 487 U.S. 781, 796 (1988), we begin our analysis by determining whether the North Dakota regulation is content neutral or content based.

The principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of disagreement with the message the speech conveys. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Id. Regulation of expressive activity is content neutral if it is justified without reference to the content of the regulated speech. Id.

Applying these principles to North Dakota's statute, it is evident that the Act is content neutral. First, North Dakota has not distinguished between professional and in-house charitable solicitors because of any disagreement with the message that would be conveyed, for the message would be identical regardless of who conveyed it. Second, the regulation can be justified without reference to the content of the regulated speech, for North Dakota's interest is in protecting residential privacy.

Although the Act appears to make a subject matter distinction between advocacy and solicitation, a regulation that distinguishes between speech activities likely to produce the consequences that it seeks to prevent and speech activities unlikely to have to those consequences "cannot be struck down for failure to maintain 'content neutrality.'" Hill v. Colorado, 530 U.S. 703, 724 (2000). As the Tenth

Circuit observed in reviewing the commercial solicitation restrictions of the national do-not-call registry, the interest in residential privacy "is not limited to the ringing of the phone; rather, how invasive a phone call may be is also influenced by the manner and substance of the call." F.T.C. v. Mainstream Mktg. Servs., Inc., 345 F.3d 850, 855 (10th Cir. 2003) (per curiam). Because solicitation may reasonably be viewed as more invasive than advocacy, we conclude that the Act is a content-neutral regulation. See United States v. Kokinda, 497 U.S. 720 (1990) (plurality of the Court upholding Postal Service regulation distinguishing between solicitation and advocacy); Nat'l Fed'n of the Blind of Arkansas, Inc. v. Pryor, 258 F.3d 851, 855 n.3 (8th Cir. 2001). (rejecting the charity's argument that the regulation was content based because it regulated only speech that solicits charitable contribution or commercial sales).

### III.

The test appropriate for regulation of professional charitable solicitation is derived from Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 636 (1980). Although the Supreme Court has not specified whether the Schaumburg test is an intermediate scrutiny review of a content-neutral regulation, we have interpreted it as such. See Pryor, 258 F.3d at 854.

We observed in Pryor that the Schaumburg test is "obviously very similar" to the time, place, and manner test enunciated in Ward. Id. at 855. We then considered: (a) whether the State had a sufficient or "legitimate" interest; (b) whether the interest identified was "significantly furthered" by a narrowly tailored regulation; and (c) whether the regulation substantially limited charitable solicitations. Id. at 855–56.

### A.

The first question under Pryor is whether the State has a sufficient or legitimate interest. We have held that residential privacy is a "significant" government interest, particularly when telemarketing calls "are flourishing, and becoming a recurring nuisance by virtue of their quantity." Van Bergen v. Minnesota, 59 F.3d 1541, 1555

(8th Cir. 1995). See also Frisby v. Schultz, 487 U.S. 474, 484 (1988) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."). The rationale underlying the North Dakota regulation falls within this significant interest.

**B.**

We next consider whether North Dakota's regulation is narrowly tailored. "The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial interest that would be achieved less effectively absent the regulation and the means chosen does not burden substantially more speech than is necessary to further the [state's] content-neutral interest." Krantz v. City of Fort Smith, 160 F.3d 1214, 1219 (8th Cir. 1998) (citations omitted); Ward, 491 U.S. at 799. When a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal. Hill, 530 U.S. at 726.

North Dakota's goal of ensuring residential privacy would be achieved less effectively if the legislature exempted professional charitable solicitors from the Act. Seeking to balance the interest of callers against the privacy rights of subscribers, the legislature distinguished between in-house and professional charitable solicitors. North Dakota contends that the distinction is based upon the sheer volume of calls because "[a] charity using paid professional telemarketers is typically able to dial substantially more residential telephone numbers than if the charity used its own volunteers and employees." Appellant's Brief at 11. In this facial challenge, we are reluctant to second-guess the North Dakota Legislature's judgment that professional charitable solicitors intrude more regularly on residents' privacy than volunteers or employees and that the Act is a necessary means of enabling its citizens to halt these intrusions. See Pryor, 258 F.3d at 856 (giving deference to the state in a facial challenge to the state's telephone solicitation regulations).

The Fourth Circuit recently upheld the Federal Trade Commission's (FTC's) charity-specific do-not-call provision.  Nat'l Fed'n of the Blind v. F.T.C., 420 F.3d 331, 341 (4th Cir. 2005).  Like the statute at issue here, the FTC regulation applied to professional charitable solicitors and exempted in-house or volunteer solicitors.  The court held that the regulations struck an appropriate balance between "[t]he rights of charities and telefunders to communicate with potential donors" and "the right of those donors to enjoy residential peace."  Id. at 349–50.  Accordingly, the court held that the provision was "a permissible governmental response to a legitimate and substantial public concern."  Id. at 350.  We find the Fourth Circuit's analysis persuasive, and we join in it in upholding the distinction between professional charitable solicitors and in-house charitable solicitors.

The appellees argue that this distinction renders the Act underinclusive because a ringing phone disrupts residential privacy whether the caller is a volunteer or a professional.  They claim that the exemption of in-house charitable fundraisers demonstrates that the Act is not related to residential privacy.  Although exceptions from an otherwise legitimate regulation of speech may undermine the government's reasons for the regulation, City of Ladue v. Gilleo, 512 U.S. 43, 52 (1994), we do not perceive that to be the case here.  North Dakota's do-not-call statute does not give one side of a debate an advantage over the other, but rather it reduces the total number of unwelcome telephone calls to private residences.  "[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case."  Ward, 491 U.S. at 801.  In the case before us, the overall problem is the intrusion on residential privacy caused by unwanted telephone solicitation.  We are satisfied that the Act furthers the state's interest in preserving residential privacy.

Additionally, the Act does not burden more speech than is necessary to further the State's interest in residential privacy.  The place to which a regulation applies must be taken into account in determining whether a statute is narrowly tailored.  Hill, 530

U.S. at 728. As the Court pointed out in <u>Frisby v. Schultz</u>, "[A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions." 487 U.S. at 484–85. Accordingly, we find it relevant that the Act applies only to personal residences. Further, a content-neutral and viewpoint-neutral opt-in provision like the one here limits the degree of government interference with First Amendment interests. <u>See</u> <u>Rowan v. United States Post Office Dep't</u>, 397 U.S. 728, 738 (1970) (statutory scheme giving sole discretion to private citizen to determine whether material was "erotically arousing or sexually provocative" avoided "possible constitutional questions that might arise from vesting the power to make any discretionary evaluation of the material in a government official"); <u>see also</u> <u>Mainstream Mktg. Servs., Inc. v. F.T.C.</u>, 358 F.3d 1228, 1242 (10th Cir. 2004) (finding the national do-not-call registry narrowly tailored because "it restricts only calls that are targeted at unwilling recipients"). Although the opt-in nature of the Act is not dispositive, we find it important that the Act's restriction is triggered only when a resident joins the do-not-call registry. Absent this affirmative private action, there is no restriction on a charity's use of professional charitable solicitors. Because the Act prohibits only calls to unwilling residents in their homes, we hold that the Act is narrowly tailored to serve the government's substantial interest in protecting residential privacy.

Finally, the Act need not be the least restrictive means to satisfy the tailoring requirement. <u>Hill</u>, 530 U.S. at 726. Although exempting all charitable solicitations from the Act or requiring a charity-specific do-not-call list would be less restrictive than North Dakota's regulation, we are not convinced that the existence of these options renders the Act unconstitutional. Because this narrowly drawn, content-neutral statute does not entirely foreclose any means of communication, we are satisfied that the Act is sufficiently tailored to pass constitutional muster.

## C.

We turn, then, to the final consideration under <u>Pryor</u>, whether North Dakota's regulation substantially limits charitable solicitations. We conclude that it does not.

The Act prohibits calls to the homes of residents who have chosen not to receive calls from professional charitable solicitors. The Act does not foreclose all means of charitable solicitation directed at these residents. Employees or volunteers may solicit funds from all North Dakota residents, and professionals may solicit funds from residents who have not registered with the state's do-not-call list. Further, the charities may launch fundraising campaigns through the mail or in person. Although the Act restricts charitable solicitation, it leaves open several alternative channels of communication. Accordingly, we conclude that the Act does not substantially limit charitable solicitation.

## IV.

Appellees argue that the Act is overbroad because it "makes no legitimate effort to distinguish telemarketing calls affecting residential privacy and innocuous speech" and it prevents unknown charities from soliciting North Dakota residents who have registered with the state's do-not-call list. Appellees' Brief at 26. "For a statute to fail on overbreadth grounds, 'there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protection of parties not before the Court.'" Pryor, 258 F.3d at 856 (quoting City Council v. Taxpayers for Vincent, 466 U.S. 789, 801(1984)). The North Dakota statute does not present that danger. When North Dakota citizens register on the do-not-call list, they choose to exclude telephone solicitation from their homes. The registrants have decided that the Act's banned phone calls intrude on their residential privacy. Further, unknown charities will be treated the same as the appellees. Appellees simply cannot support their claim that the Act impermissibly curtails the First Amendment rights of parties not before this court.

## Conclusion

In holding that the Act does not run afoul of the First Amendment, we echo Judge Wilkinson's observations:

> In reviewing these rules, we have no wish to exaggerate. Not every home is a "peaceable kingdom." And it is not the end of the world when a family receives an abandoned call or a late night call that interrupts its evening. But it is one more small strain that families already stressed by twenty-first century life are forced to endure. Our Constitution does not require that we add to family burdens by forbidding even the most reasonable and minor restrictions on telemarketing practices. . . . Our Constitution does not prevent the democratic process from affording the American family some small respite and sense of surcease.

Nat'l Fed'n of the Blind v. F.T.C., 420 F.3d at 343, 351.

North Dakota's narrowly tailored do-not-call statute significantly furthers the state's interest in residential privacy. The Act does not substantially limit charitable solicitations and is not unconstitutionally overbroad.

The judgment is reversed, and the case is remanded to the district court with direction to dismiss the complaint. Likewise, the order awarding attorney's fees is reversed.

HEANEY, Circuit Judge, dissenting.

I agree that the State of North Dakota has a legitimate interest in preserving residential privacy. Because I do not believe that its regulation is narrowly tailored to serve that goal, I respectfully dissent.

A "direct and substantial limitation" on charitable speech "cannot be sustained unless it serves a sufficiently strong, subordinating interest that [the government] is entitled to protect," and is narrowly drawn to serve the interest "without unnecessarily interfering with First Amendment freedoms." Village of Shaumburg v. Citizens for a Better Env't, 444 U.S. 620, 636-37 (1980). Sec'y of State v. Joseph H. Munson Co., Inc., 467 U.S. 947, 960-61 (1984). But see Nat'l Fed'n of the Blind of Ark., Inc. v. Pryor, 258 F.3d 851, 854-55 (8th Cir. 2001) (citing the Supreme Court's standard of analysis for restrictions on charitable speech but applying a different, more lenient standard).

Consistent with Supreme Court precedent, the first consideration is whether North Dakota's Act directly and substantially limits charitable solicitation activity. I believe that it does. The law prohibits charities from hiring professional telemarketers to solicit funds for them, and it also provides civil penalties for charities who violate the law. The next inquiry is whether the Act serves a sufficiently strong, subordinating interest that the state is entitled to protect. I agree that protection from the invasion of residential privacy by unwanted solicitations is such an interest. See Frisby v. Schultz, 487 U.S. 474, 484 (1988); Carey v. Brown, 447 U.S. 455, 471 (1980); Rowan v. U.S. Post Office Dep't., 397 U.S. 728, 737 (1970).

I do not agree, however, that North Dakota's regulation is narrowly drawn to serve the government's interest without unnecessarily interfering with First Amendment freedoms. First, the Act is overly restrictive. Telefunders in North Dakota are completely prohibited from soliciting charitable funds from members of the do-not-call list, no matter the time of the day nor the percentage of contributions earmarked for the charity. The state does not have a charity-specific do-not-call list, so North Dakotans who are adverse to commercial solicitation but open to charitable solicitation in their homes do not have the opportunity to hear the telefunders' messages. The regulation prevents potentially willing listeners from engaging in discourse about charitable contributions.

-17-

Furthermore, the Act is underinclusive. A law is underinclusive, and therefore not narrowly tailored, when it discriminates against some speakers but not others without a legitimate neutral justification for doing so. City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429-30 (1993). "Even where, as here, the government has a compelling interest in regulating a particular type of speech, its distinctions between similarly situated actors must reflect a 'reasonable fit' between the restriction and the goal to be achieved by the disparate treatment." Nat'l Fed'n of the Blind v. FTC, 420 F.3d 331, 351 (4th Cir. 2005) (Duncan, J., dissenting) (quoting Discovery Network, 507 U.S. at 417);[3] Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 789-92 (1988). Telefunders' and charities' in-house solicitors' messages are the same, and both types of speakers intrude into the privacy of the home. It remains unclear, then, why the government has restricted the charitable speech of an unknown percentage of callers that invade residential privacy when so many other groups may intrude upon that privacy, thus diminishing the credibility of the government's rationale for restricting telefunders' speech.

The state has provided no statistics to support its assertion that its restriction on telefunders' charitable solicitations will significantly reduce the number of telephone intrusions into private residences. While I might agree as a matter of common sense that prohibiting calls made by telefunders will limit the number of intrusions, the state

---

[3]The majority's holding is based in part on the Fourth Circuit's analysis in National Federation of the Blind. The Telemarketing Sales Rule, the regulation at issue in that case, was found to be a constitutional restriction on charitable speech. Notably, the TSR permits telefunders to call members of the national do-not-call list between the hours of 8:00 a.m. and 9:00 p.m., but not members of charity-specific do-not-call lists. The TRS is less restrictive than North Dakota's Act and is inapposite to the analysis before us.

has failed to support that contention in the record.[4] See Nat'l Fed'n of the Blind, 420 F.3d at 353 (Duncan, J., dissenting) ("[T]he FTC again presents *no evidence* that telefunders are more likely to be violators of consumer privacy or engage in abusive telemarketing practices than in-house solicitors. There is *no suggestion* in the record that consumers are more likely to feel that their privacy is invaded when receiving a call from a telefunder than a volunteer or in-house employee of a charitable organization."); Discovery Network, 507 U.S. at 426 (holding that a selective ban on commercial newsracks was not justifiable merely because it would "in some small way limit the total number of newsracks").

North Dakota has failed to demonstrate that its ban on telefunders' calls will restore, or even significantly improve, residential privacy. Therefore, I would affirm the district court and hold that North Dakota's direct and substantial limitation on charitable speech cannot be sustained because, although it serves a sufficiently strong, subordinating interest that the state is entitled to protect, it is not narrowly drawn to serve the interest.

———————————————

[4]Several states submitted amicus briefs to buttress North Dakota's claim, but statistics from other states are not relevant to our assessment of the North Dakota regulation. Also, the majority supports its holding that the Act is narrowly drawn by relying on the North Dakota Legislature's conclusion that telefunders invade residential privacy more regularly than charitable volunteers or employees. Yet nothing in the record provides a basis for the Legislature's conclusion.