WILLIAMS, Circuit Judge,
concurring.
I agree that the Indiana Act survives constitutional scrutiny. I write separately because I respectfully disagree with the majority’s application of Rowan v. United States Post Office Dep’t, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). Specifically, I disagree with the majority’s conclusion that Rowan compels the application of a stand-alone test that requires nothing more than a balancing of the parties’ interests. Because I believe that Rowan must be read in the context of subsequent Supreme Court authority, which established that a regulation affecting charitable speech must be narrowly tailored to advance a substantial governmental interest, I disagree with the majority’s reliance on a test that circumvents this firmly-established narrow-tailoring requirement. See, e.g., Vill. of Schaumburg v. Citizens for a Better Env’t, 444 U.S. 620, 637, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (establishing the applicable First Amendment test for regulations affecting charitable speech). Neither Rowan nor subsequent case law compels such a departure from bedrock constitutional principles pertaining to charitable speech. Accordingly, I would apply the traditional First Amendment test in this case, under which, as described below, the Indiana Act survives in any event.
As the majority recognizes, charitable speech is entitled to heightened constitutional protections. Beginning in 1980- — ten years after the Rowan decision — the Supreme Court issued a trilogy of cases that clarified the heightened First Amendment protections applicable to charitable speech. See Vill. of Schaumburg, 444 U.S. at 636-38, 100 S.Ct. 826; Sec’y of State of Md. v. Joseph H. Munson Co., Inc. (“Munson”), 467 U.S. 947, 960-61, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); Riley v. Nat’l Fed’n of the Blind of N.C., Inc., 487 U.S. 781, 787-92, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In these cases, the Supreme Court unambiguously held that charitable speech, including charitable solicitations, is not commercial speech and is therefore not subject to the lower (but nonetheless substantial) First Amendment protections provided for commercial speech. See, e.g., Vill. of Schaumburg, 444 U.S. at 632-33, 100 S.Ct. 826. Instead, charitable solicitations are fully protected because they are “characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease.” Id. at 632, 100 S.Ct. 826; see also Gresham v. Peterson, 225 F.3d 899, 904 (7th Cir.2000) (noting that the Supreme Court has “placed charitable solicitations by organizations in a category of speech close to the heart of the First Amendment, and distinguished it from ‘purely commercial *793 speech’ ” which “has been placed lower in the First Amendment food chain, somewhere between political speech and pornography”); Nat’l Fed. of the Blind of Arkansas, Inc. v. Pryor, 258 F.3d 851, 854 (8th Cir.2001) (“The Supreme Court has repeatedly held that charity fund-raising involves speech that is fully protected by the First Amendment.”). Thus, a government may not regulate charitable speech unless the regulation (1) serves a “sufficiently strong” government interest and (2) is “narrowly drawn” to “serve those interests without unnecessarily interfering with First Amendment freedoms.” Vill. of Schaumburg, 444 U.S. at 636-37, 100 S.Ct. 826; see also Gresham, 225 F.3d at 905; Nat’l Fed. of the Blind v. F.T.C., 420 F.3d 331, 338 (4th Cir.2005). Following the Village of Schaumburg decision, this court has uniformly applied the narrow-tailoring requirement to regulations affecting charitable speech.[1]
Rather than apply this standard narrow-tailoring requirement, the majority instead relies on the Rowan decision, which it reads as requiring only a balancing of interests between the parties. As an initial matter, the statute at issue in Rowan directly addressed commercial speech, not charitable speech. See Rowan, 397 U.S. at 729, 90 S.Ct. 1484 (statute’s prohibitions applied to “pandering advertisements”). This distinction has constitutional significance: the First Amendment provides greater protections to charitable speech than commercial speech, including heightened constitutional scrutiny.[2] See Gresham, 225 F.3d at 904. Setting aside this difference, even within the limited context of commercial speech, the Rowan balancing-of-interests test is not the governing law. Indeed, the Supreme Court did not clearly recognize the First Amendment protections applicable to commercial speech until 1975 — five years after Rowan was decided. See Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 64-65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (noting that “[bjeginning with Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), this Court extended the protection of the First Amendment to commercial speech”). Then, five years later in 1980, the Court issued the seminal Central Hudson decision, which established the current governing test for First Amendment challenges to commercial speech. See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Like the charitable speech test, the Central Hudson test for commercial speech requires courts to consider whether a regulation affecting *794 commercial speech is narrowly tailored.[3] See Central Hudson, 447 U.S. at 565, 100 S.Ct. 2343. Thus, whatever Rowan has to say regarding the test applicable to First Amendment challenges involving commercial speech must be filtered through subsequent Supreme Court authority. In other words, to the extent that Rowan articulated a simple balancing-of-interests test, such a test is no longer the controlling law even in the commercial speech arena, much less in the more-highly protected charitable speech context. See id.
This is not to say that the principles addressed in Rowan regarding the compelling government interest in residential privacy are no longer good law. To the contrary, the substantial right of residents to find sanctuary in their homes, free from unwanted speech, is just as — if not more— vital today, where intrusions via the mail, the telephone and, now, email and the internet are ubiquitous. The Supreme Court has repeatedly cited Rowan for support in highlighting the sanctity of residential privacy, particularly where the homeowner is a “captive audience” to unwanted speech.[4] But Rowan has not been cited by the Supreme Court for the proposition that regulations that affect commercial— much less charitable — speech should be examined via a simple balancing test. Instead, the Supreme Court has limited its application of Rowan within the context of traditional First Amendment tests, either to establish the significance of residential privacy interests and/or to address the narrow-tailoring or least-restrictive-means requirements. See id.
Nor has this court previously held that Rowan created a separate balancing-of-interests test under any type of First Amendment analysis. Rather, consistent with Supreme Court jurisprudence, we have limited our application of Rowan to the framework of whether the regulation was narrowly tailored (or, relatedly, whether the government had a sufficiently strong interest in protecting residential privacy).[5]
*795 Thus, why the majority turns to Rowan for this new-found test is unclear. Although the majority notes that the Indiana Act requires the homeowner to make an initial affirmative act (ie., signing up for the do-not-call list), this court is not without guidance from our prior cases, as well as cases from other circuits, all of which have considered such opt-in features or other analogous provisions to be pertinent to whether a regulation is narrowly tailored — not as a means to avoid a narrow-tailoring analysis entirely. For instance, in Pearson v. Edgar, 153 F.3d 397 (7th Cir.1998), we addressed a First Amendment challenge to an Illinois statute that allowed homeowners to notify real estate agents that they did not wish to be solicited, and, upon such notification, prohibited door-to-door solicitation. Id. at 399. The fact that the statute in Pearson required a predicate affirmative act from the homeowner (ie., notifying the realtor) did not lead us to apply a Rowan balancing test. Instead, we applied the standard Central Hudson narrow-tailoring analysis. Id. at 402-03. And the court was well aware of Rowan, discussing it at length, but, tellingly, solely within the context of whether the regulation was narrowly tailored to advance the state’s substantial interest. Id. at 404-05; see also South-Suburban Housing Center, 935 F.2d at 894 (discussing the Roivan opt-in feature within a narrow-tailoring analysis). The court also noted that our reliance on Rowan in two prior cases[6] had been “weakened by Discovery Network’s emphasis on reasonable fit,” which, again, appropriately placed Rowan squarely within the analytic framework of narrow tailoring. Id. at 404.[7]
In examining the constitutionality of the federal do-not-call list, the Tenth Circuit similarly devoted extensive attention to the opt-in feature in the Rowan statute, but did so solely within the context of considering whether the federal do-not-call list was narrowly tailored. See Mainstream Mktg. Services, Inc. v. F.T.C. (Mainstream Mktg. II), 358 F.3d 1228, 1243-44 (10th Cir.2004). Specifically, the Tenth Circuit held that the opt-in feature in the federal do-not-call list was a compelling factor in establishing that the statute was narrowly tailored. Id. Similarly, in a precursor case to Mainstream Marketing II, the Tenth Circuit cited our decision in Pearson, noting that “[ojther courts have relied on Rowan’s analysis in finding that similar mechanisms of private choice in solicitation restrictions weigh in favor of finding a ‘reasonable fit[,]’ ” and held that “Rowan demonstrates that the element of private choice in an opt-in feature is relevant for purposes of analyzing ‘reasonable fit’ ”. F.T.C. v. Mainstream Mktg. Serv’s., Inc. (Mainstream Mktg. I), 345 F.3d 850, 856 (10th Cir.2003) (citing Anderson v. Tread- *796 well, 294 F.3d 453, 462-63 (2d Cir.2002) and Pearson, 153 F.3d at 404). Thus, the authority in both this circuit and other circuits indicates that the Indiana Act’s opt-in feature does not allow it to circumvent full First Amendment scrutiny when it regulates — even if indirectly — protected speech.
In any event, the Indiana Act is distinguishable from the Rowan statute. The majority claims that the Indiana Act places the Attorney General in solely a “ministerial” role akin to the role of the Postmaster General in Rowan, purportedly because the Attorney General is given sole discretion only “to decide if the call was placed on behalf of a tax-exempt charity, or if the person who placed the call was a volunteer or employee of that charity.” Op. at 11. But this considers only the state’s involvement in enforcing the statute: it ignores the state’s active involvement in crafting numerous exceptions to the statute. Unlike in Rowan, the state here has carved out particular categories of calls that a homeowner cannot block. These state-created carve-outs include not only charitable calls made by volunteers and employees, but also certain calls by newspaper organizations, real estate agents, and insurance agents. Thus, the homeowner here does not have the plenary power to restrict all intrusions as the homeowner could in Rowan. Instead, Indiana has actively immersed itself in regulating the forms of telemarketing speech that homeowners are allowed to block: a homeowner has unfettered discretion to block calls from professional telemarketers, but lacks such discretion when it comes to, for example, calls initiated by employees or volunteers of charities. In my view, this is something more than the mere “ministerial” duty addressed in Rowan, where the government did nothing more than enforce a homeowner’s “complete and unfettered discretion” to prevent all intrusions.[8] Rowan, 397 U.S. at 734, 90 S.Ct. 1484; cf. Pearson, 153 F.3d at 404 (distinguishing Rowan on the basis that the statute there provided unqualified delegation of authority to the homeowner and disapproving of an Illinois statute in which the government crafted the initial distinction between real estate solicitations and other types of solicitations).
Setting aside these distinctions, the majority’s opinion is also inconsistent with a series of decisions by other circuits — all of whom uniformly applied the narrow-tailoring requirement to analogous do-notrcall regulations. See Mainstream Mktg. I, 345 F.3d at 856; Mainstream Mktg. II, 358 F.3d at 1242-44; Nat’l Fed’n of the Blind, 420 F.3d at 334; Fraternal Order of Police, N.D. State Lodge v. Stenehjem, 431 F.3d 591, 596 (8th Cir.2005). In addition, although all of these cases cite to Rowan, none apply the balancing-of-interests test that the majority imports from Rowan.
For instance, the Fourth Circuit addressed a First Amendment challenge to the Federal Trade Commission’s regula *797 tion imposing restrictions on telemarketing practices used for charitable fundraising. Nat’l Fed’n of the Blind, 420 F.3d at 334. Like the Indiana Act here, the FTC regulation prohibited calls from professional telemarketers, but not calls by in-house charity staff or volunteers. Id. Relying on the Village of Schaumburg, Munson, and Riley Supreme Court cases, the Fourth Circuit set forth the governing test under the First Amendment as follows: “A regulation will be sustained if (1) it ‘serves a sufficiently strong, subordinating interest that the [government] is entitled to protect’ and (2) it is ‘narrowly drawn ... to serve the interest without unnecessarily interfering with First Amendment freedoms.’ ” Id. at 338 (citing Munson, 467 U.S. at 960-61, 104 S.Ct. 2839 (quoting Schaumburg, 444 U.S. at 636-37, 100 S.Ct. 826)). Significantly, the Fourth Circuit’s disposition relied heavily on Rowan — but not for the proposition that Rowan altered the governing constitutional test specified in Village of Schaumburg and its progeny. Instead, the Fourth Circuit relied on Rowan in holding that there was a substantial government interest in residential privacy and, more importantly, that the regulation was narrowly drawn because of its opt-in (or, in the Fourth Circuit’s term, “opt-out”) nature:
The parallels between the law at issue in Rowan and the do-not-call list in this case are unmistakable. If consumers are constitutionally permitted to opt out of receiving mail which can be discarded or ignored, then surely they are permitted to opt out of receiving phone calls that are more likely to disturb their peace. In this way, a do-not-call list is more narrowly tailored to protecting privacy than was the law in Rowan.
Id. at 342 (emphasis added).
Similarly, the Tenth Circuit applied the traditional narrowly tailored requirement in assessing a First Amendment challenge to the FTC regulations applicable to commercial speech. Mainstream Mktg. II, 358 F.3d at 1242-44. Like the Fourth Circuit, the Tenth Circuit placed significant reliance on Rowan and the opt-in nature of the statute there, but, again, confined its application of Rowan to the traditional framework of whether the regulation was narrowly tailored (i.e., a “reasonable fit” in light of the government’s substantial government interest):
Like the do-not-mail regulation approved in Roivan, the national do-not-call registry does not itself prohibit any speech. Instead, it merely “permits a citizen to erect a wall ... that no advertiser may penetrate without his acquiescence.” See Rowan, 397 U.S. at 738, 90 S.Ct. 1484, 25 L.Ed.2d 736. Almost by definition, the do-not-call regulations only block calls that would constitute unwanted intrusions into the privacy of consumers who have signed up for the list. Moreover, it allows consumers who feel susceptible to telephone fraud or abuse to ensure that most commercial callers will not have an opportunity to victimize them. Under the circumstances we address in this case, we conclude that the do-not-call registry’s opt-in feature renders it a narrowly tailored commercial speech regulation.
Id. at 1243. (emphasis added); see also Mainstream Mktg. I, 345 F.3d at 856 (limiting Rowan to the context of a narrow-tailoring analysis).
Finally, the Eighth Circuit also examined the constitutionality of a state statute that, like the Indiana Act, prohibited charitable solicitation calls by professional telemarketers, but permitted calls made by employees or volunteers. Fraternal Order of Police, 431 F.3d at 596. In harmony with the Fourth and Tenth Circuits, the Eighth Circuit similarly relied on Rowan, but, once again, solely to establish whether the statute was narrowly tailored. Id. at *798 598-99; see also Pryor, 258 F.3d at 855-56 (relying on Rowan to determine that the Deceptive Trade Practice Act’s limitations on charitable speech were narrowly tailored).
In distinguishing the Eighth and Tenth circuit cases, the majority states that “[njeither the Eighth Circuit nor the Tenth Circuit directly addressed a Rowan argument similar to the one the State presses here. Instead, they reversed by employing more standard First Amendment analysis.” Op. at 788. True — but these circuits, along with the Fourth Circuit, were unmistakably aware of Rowan, and in fact relied extensively upon it to conduct the standard narrow-tailoring analysis. Furthermore, the Attorney General of Indiana filed an amicus brief (along with various other states) in the Eighth Circuit’s Fraternal Order of Police case in support of a North Dakota statute pertaining to charitable speech solicitations, which the Attorney General conceded was “similar” to the Indiana Act. Brief for State of Indiana et al. as Amici Curiae Supporting Appellant at 2, 13, Fraternal Order of Police, N.D. State Lodge v. Stenehjem, 431 F.3d 591 (8th Cir.2005) (Nos.03-3848, 04-1619, 04-1620), 2003 WL 23912560. As it now argues here, the Attorney General of Indiana argued before the Eighth Circuit that Rowan provided a mere balancing-of-interests test in these circumstances. Id. at 25-32. The Eighth Circuit did not accept this invitation to apply such a test and instead applied the traditional Village of Schaumburg First Amendment test, which required consideration of whether the statute was narrowly tailored. Fraternal Order of Police, 431 F.3d at 597-99.
Similarly, several states filed an amicus brief in the Tenth Circuit’s Mainstream Marketing II case, supporting the federal do-not-call regulations applicable to commercial solicitors. See Brief for State of California, et al. as Amici Curiae Supporting Appellants in Case No. 03-1429 and Supporting Appellees in Case No. 03-9571 at 1-3, Mainstream Mktg. Services, Inc. v. F.T.C., 358 F.3d 1228 (2004) (Nos.03-1429, 03-6258, 03-9571, 03-9594), 2003 WL 24033594. Like the Attorney General of Indiana here, the states argued that Rowan created a balancing test, but the Tenth Circuit did not apply such a test in its decision. See id. at 4-10; cf .Mainstream Mktg II, 358 F.3d at 1242-44. Instead, the Tenth Circuit applied the traditional Central Hudson test, which required an examination of whether the statute was narrowly tailored. Id. Thus, at a minimum, these circuits did not interpret Rowan as requiring nothing more than a balancing of interests. More likely, they appropriately disregarded the states’ request for a truncated balancing-of-interests test and instead applied Rowan solely within the constraints created by subsequent Supreme Court authority.
I would apply a similar First Amendment analysis here to conclude that the charitable exception in the Indiana Act is content neutral and narrowly drawn to advance the substantial right of residents to be undisturbed by unwanted phone calls in the privacy of their homes. See, e.g., Fraternal Order of Police, 431 F.3d at 596-99 (holding that an analogous North Dakota statute was content neutral under Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) and was narrowly tailored); Nat’l Fed’n of the Blind, 420 F.3d at 342-44 (holding than the FTC’s “do not call” regulations pertaining to charitable speech were narrowly drawn to serve the government’s interests); Mainstream Mktg. I, 345 F.3d at 855-56 (upholding FTC’s do-not-call regulations pertaining to commercial speech because they were narrowly drawn to serve a substantial governmental interest). Although the question of whether the Indiana Act is a content neutral regulation is a close one, *799 it is nonetheless a “regulation that serves purposes unrelated to the content of expression ... even if it has an incidental effect on certain speakers or messages but not others.” Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). That is, the record reflects that the exemptions that Indiana has made for in-house employees or volunteers of charities are not based upon disdain for the content of the message conveyed, but rather are based on the form or manner in which the message is delivered.[9] Specifically, there was compelling evidence in the record that professional telemarketers have the capacity to generate a significantly greater number of telephone calls than in-house employees or volunteers, and thus, irrespective of the content of the message, have greater capacity to cause disruptions to residential privacy. Indeed, as the Eighth Circuit noted in analyzing a North Dakota statute with very similar provisions to the Indiana Act, “North Dakota has not distinguished between professional and in-house charitable solicitors because of any disagreement with the message that would be conveyed, for the message would be identical regardless of who conveyed it.” Fraternal Order of Police, 431 F.3d at 596. In addition, “a regulation that distinguishes between speech activities likely to produce the consequences that it seeks to prevent and speech activities unlikely to have those consequences ‘cannot be struck down for failure to maintain content neutrality.’ ” Id. at 596-97 (citing Hill v. Colorado, 530 U.S. 703, 724, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)).
There can be no doubt that Indiana has a substantial interest in protecting residential privacy. Rotean and its progeny firmly establish residential privacy as a compelling interest. Furthermore, the Indiana Act is also narrowly tailored to advance this interest. Consistent with the holdings in this and other circuits, the opt-in feature is strong evidence of the narrow tailoring of the Indiana Act’s restrictions on charitable speech. See, e.g., Pearson, 153 F.3d at 399, 403; South-Suburban Housing Center, 935 F.2d at 894; Nat'l Fed’n of the Blind, 420 F.3d at 342; Fraternal Order of Police, 431 F.3d at 598-99; Mainstream Mktg. II, 358 F.3d at 1242-44. Rather than simply issue blanket prohibitions against all charitable speech provided by professional telemarketers, the statute allows homeowners to decide individually whether they find these types of calls intrusive. In addition, as noted above, the exemptions in the statute are sensible carve-outs based upon the likelihood of intrusiveness of particular forms of telephone calls, rather than an attempt to regulate content. In this sense, Indiana is seeking to target as directly as possible those telemarketing calls that are most likely to disrupt residential privacy. Accordingly, the Indiana Act survives constitutional scrutiny under the standard First Amendment test applicable to charitable speech.
*800 I emphasize the importance of applying full constitutional scrutiny in this case because First Amendment protections, of course, reside at the core of our democratic process and are crucial to the free exchange of ideas. In the present case, applying lowered constitutional scrutiny may initially appear less troubling because the form of the speech here (ie., solicitation calls placed by telemarketers) is plainly disfavored by many. But providing such a potentially broad circumvention from full First Amendment scrutiny may prove to be an unfortunate choice when less-disfavored forms of speech are at issue in the future. For the reasons stated above, I believe the proper analysis requires consideration of whether the Indiana Act is a content neutral regulation narrowly tailored to advance a substantial government interest, in accordance with the traditional First Amendment test.

. See, e.g., Wis. Action Coal. v. City of Kenosha, 767 F.2d 1248, 1251-59 (7th Cir.1985) (noting that the Supreme Court "has also repeatedly stated that a regulation must be narrowly drawn” and applying a narrow-tailoring analysis); City of Watseka v. Ill. Pub. Action Council, 796 F.2d 1547, 1552-57 (7th Cir.1986) (noting that the Supreme Court routinely requires that a time, place, and manner regulation be "narrowly tailored” and applying a four-part test that required consideration of whether the regulation was "narrowly tailored to serve the government objective”); Nat’l People’s Action v. Vill. of Wilmette, 914 F.2d 1008, 1012-13 (7th Cir. 1990) (noting that the Supreme. Court has reaffirmed "emphatically” that a regulation geared toward protected speech must be narrowly tailored and applying such an analysis); Gresham v. Peterson, 225 F.3d 899, 905-06 (7th Cir.2000) (noting that regulations must be "narrowly tailored to serve a significant government interest” and applying such a test).

. This is not intended to suggest that Rowan 's teachings pertaining to the substantial government interest in protecting residential privacy are not relevant when considering First Amendment challenges to charitable speech restrictions. As discussed infra, these principles continue to be applied routinely in cases involving both commercial and charitable speech, but Rowan's balancing-of-interests test does not appear to have survived the test of time.

. The Central Hudson lest also requires consideration of whether (1) the speech concerns lawful activity and is not misleading; (2) the asserted governmental interest is substantial; and (3) the regulation directly advances the governmental interest. Central Hudson, 447 U.S. at 566, 100 S.Ct. 2343. Although the Central Hudson test is quite similar to the Village of Schaumburg test for charitable speech, regulations affecting charitable speech receive heightened scrutiny and, unlike commercial regulations, are presumptively invalid if they are not content neutral. See Vill. of Schaumburg, 444 U.S. at 636-37, 100 S.Ct. 826; Gresham, 225 F.3d at 904; Fraternal Order of Police, N.D. State Lodge v. Stenehjem, 431 F.3d 591 (8th Cir.2005) (discussing and analyzing content-neutrality of regulation affecting charitable speech).

. See, e.g., Vill. of Schaumburg, 444 U.S. at 639, 100 S.Ct. 826 (noting the interest in residential privacy and citing Rowan within a narrow-tailoring analysis); Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 530, 542 n. 11, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (same); Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (citing Rowan to establish the substantial interest in residential privacy); Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 72, 77-78, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (same); Frisby v. Schultz, 487 U.S. 474, 482-85, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (same); United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 814-15, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (citing Rowan within a least-restrictive-means analysis); Hill v. Colorado, 530 U.S. 703, 717-18, 720, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (citing Rowan within the context of a narrow-tailoring analysis).

.See, e.g., Collin v. Smith, 578 F.2d 1197, 1202 n. 8 (7th Cir.1978) (citing to Rowan for the proposition that the ordinances at issue were not “appropriately narrow ordinances’’); Curtis v. Thompson, 840 F.2d 1291, 1301-02 (7th Cir.1988) (applying Rowan to a narrow-tailoring analysis pertaining to a commercial speech ordinance); South-Suburban Housing Ctr. v. Greater South Suburban Bd. of *795 Realtors, 935 F.2d 868, 892-94 (7th Cir.1991) (same); Pearson v. Edgar, 153 F.3d 397, 403-05 (7th Cir.1998) (same).

. Pearson was decided after the Supreme Court vacated our prior decision and remanded the case for reconsideration in light of the then-recently decided City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). See Pearson, 153 F.3d at 400 (discussing the procedural history).

. See also Vill. of Schaumburg, 444 U.S. at 639, 100 S.Ct. 826 (citing Rowan for the proposition that ''[o]ther provisions of the ordinance, which are not challenged here, such as the provision permitting homeowners to bar solicitors from their property by posting signs reading “No Solicitors or Peddlers Invited,” § 22-24, suggest the availability of less intrusive and more effective measures to protect privacy”); Playboy Entertainment Group, Inc., 529 U.S. at 814-15, 120 S.Ct. 1878 (citing Rowan and noting that affirmative acts by homeowners, such as individualized household blocking of unwanted cable television channels, are relevant to whether a statute is the least restrictive means of enforcing a government interest in residential privacy).

. The majority cites to footnote 4 in the Rowan decision as support for the proposition that the Supreme Court did not intend to limit Rowan solely to situations where a homeowner has complete discretion to block intrusions on residential privacy. Op. at 10. My reading of this footnote, however, offers no clues as to the ''intent” that the majority ascribes to the Supreme Court. Instead, the footnote merely highlights the central distinguishing element of the Rowan statute: the government had no role in filtering the types of mail the homeowner could prevent from entering the home. The footnote goes on to highlight that had the government been involved in any form of filtering, the statute would not have been upheld. This is precisely the hurdle that the Indiana Act stumbles on. There is otherwise nothing in the footnote suggesting that the Court intended to expand Rowan beyond the operative facts of the statute at issue. If anything, the footnote emphasizes the limited focus of the Rowan opinion.

. The district court in this case analyzed the statute as a time, place or manner regulation. The First Amendment test for such a regulation is essentially identical to the Village of Schaumburg test, except for the added requirement that there be ample opportunities for alternative means of communication. See Fraternal Order of Police, 431 F.3d at 597 (noting that the Schaumburg test is "very similar” to time, place, or manner regulation). As the district court correctly concluded, there can be no doubt that the Indiana Act allows for sufficient alternate means of communication. For instance, the charities are not precluded from using their own employees or volunteers to solicit funds, nor are they prevented from using direct mailings, newsprint advertisements, or the internet to solicit funds. Thus, the Indiana Act would also pass constitutional scrutiny if analyzed as a time, place, or manner regulation.